# LAMPITT vs. STATE*
## (No. 1171; Jan. 26, 1926; 242 Pac. 812)

CRIMINAL LAW—HOMICIDE—SUFFICIENCY OF EVIDENCE—CIRCUM-
STANTIAL EVIDENCE—USE OF EXPLOSIVES—ABSENT WITNESSES.

1. In prosecution for murder, evidence *held* to sustain finding
that death was caused by explosion of nitroglycerin or
dynamite or both together, and not by explosion of illu-
minating gas.

2. In prosecution for murder of one killed by. explosion of
nitroglycerin or dynamite or both together, evidence *held* .
sufficient to support conviction of murder in first degree.

3. In prosecution for murder by use of explosives, claimed to
have been stolen, evidence that some of stolen explosives
were found with string used in tying bacon, some of which
had been bought by accused shortly before explosion, was
proper for consideration of jury.

4. Circumstantial evidence does not fail when weakest link
thereof is broken, but depends on strength of all com-
bined circumstances.

5. In prosecution for murder by use of explosives, exclusion of
evidence of presence and movements of automobiles short-
ly before and soon after explosion, where no offer was
made to show that occupants of cars had anything to do
with explosion, was not error.

6. In prosecution for murder, admitting testimony that ac-
cused was angry at deceased six months before offense,
was not error; remoteness going only to its weight.

7. In prosecution for homicide by use of explosives, where
state introduced evidence showing theft of explosives by
forcing locked door, testimony that witness saw accused
open a lock about ten days before explosion was not in-
admissible, because of remoteness.

8. In prosecution for murder by use of explosives, error, if
any, in excluding testimony as to result of experiments
with explosives, was not prejudicial where witnesses who
made experiment testified from general knowledge as to
effect of explosives.

9. For evidence of experiments to be admissible in evidence,
there must be similarity in such circumstances and con-
ditions as might supposedly affect result.

10. Where accused's trial for murder did not take place till nearly ten months after his arrest, refusal of continuance for absence of witness who was in another state, and for whom accused did not issue subpoena until shortly before trial, claiming to rely on state to produce him, was not reversible error.

*NOTE—See Headnotes (1) 30 C. J. p. 288 n. 68 (2) 30 C. J. p. 312 n. 42 (3) 30 C. J. p. 209 n. 75 (4) 16 C. J. p. 766 n. 67 (5) 30 C. J. p. 166 n. 95 (6) 30 C. J. p. 158 n. 24 (7) 30 C. J. p. 198 n. 5 (8) 17 C. J. p. 333 n. 95 (9) 16 C. J. p. 563 n. 37 (10) 16 C. J. p. 493 n. 54.

ERROR to District Court, Big Horn County; PERCY W. METZ, Judge.

Albert Lampitt was convicted of murder in the first degree without capital punishment, and he brings error. Other material facts are stated in the opinion.

*C. A. Zaring, Lin I. Noble* and *Wm. L. Simpson* for plaintiff in error.

The evidence of the state is circumstantial, and insufficient to support a verdict of first degree murder, or any verdict against the defendant within the rules; evidence which inferentially proves the principal fact by establishing a condition of circumstances, whose existence is a premise from which the principal facts may be concluded by laws of reason, is circumstantial evidence; but each necessary link in the chain must be proved beyond a reasonable doubt to sustain a conviction in a criminal case; each material circumstance must be proved beyond a reasonable doubt; People vs. Aiken, 66 Mich. 460; Sumner vs. State, 5 Blackf. 579, 36 Am. Dec. 561; Horn vs. State, 1 Kans. 42-81 Am. Dec. 499N; Com. vs. Webster, 5 Cush (Mass.) 295, Am. Dec. 711N; State vs. Williams, 78 Am. Dec. 253; Rippey vs. Miller, 62 Am. Dec. 182; Gennon vs. People, 127 Ill. 507-11 Am. St. Rep. 147N; to warrant a conviction on circumstantial evidence the jury must be satisfied to a moral certainty and beyond a reasonable doubt of the guilt of the accused; Faulk vs. State, 53 Ala. 415; Com. vs. Webster, supra; each necessary link, and each and every

necessary fact must be proven; Walbridge vs. State, 13 Nebr. 236; People vs. Suidici, 110 N. Y. 503; 1 Starkey on Ev. 502; facts consistent with a supposition of guilt are not sufficient; Horn vs. State, 12 Wyo. 80; 1 Wigmore on Evidence 208; If circumstances can be reconciled with some other reasonable theory defendant should not be convicted; Gardner vs. State, 27 Wyo. 323-325; 16 C. J. 766; the entire record in this case demonstrates the existence of excitement and passion in the community which were the governing elements in the conviction of defendant, rather than competent evidence. ˙ The entire record is summarized and annexed for the reason that it seems necessary to carefully survey the entire circumstances as shown by the evidence, in order to understand the defects in the chain of circumstances.

*David J. Howell*, Attorney General, *L. C. Sampson*, Deputy Attorney General, *R. B. West* and *A. M. Gee* for defendant in error.

Points not argued but reserved in plaintiff's brief are:

1st. Refusal to quash jury list which is sustained by McKinney vs. State, 3 Wyo. 713.

2nd. Refusal of continuance for absent witnesses whose testimony was desired for impeachment of prosecuting witness, was properly denied; Wharton's C. P. 3rd ed. 1625; Underhill Criminal Ev. 268; no diligence shown; Keffer vs. State, 12 Wyo. 49.

3rd. Endorsement of additional names on information not error; 7427 C. S.

4th. Evidence on examination of juror which is not contained in the record and not renewable; 735 and 6375 C. S.

5th, 6th, and 7th relate to reception of evidence as to defendant's demeanor and conduct and was proper; 1 Wigmore 755-756; rejection of evidence for impeachment of witness was proper; Horn vs. State, supra; the experimental

explosion and destruction of another building to demon-
strate nature of explosives was not admissible; Wigmore on
Evidence, 442; State vs. Justice (Ore.) 8th Pac. 337; Did-
dons vs. Ter. (Okla.) 115 Pac. 129; Ftires vs. State, 50
Fla. 121; Mueller Bros. Art. Mfg. Co. vs. Fulton Street
Market, 181 Ill. App. 685; Underhill's Criminal Evidence
3rd Edition, 368; Hisler vs. State, (Fla.) 42 So. 692;
specifications relating to the instructions given or refused;
the court's ruling is sustained by People vs. Curtis, 97
Mich. 489; 56 N. W. 925; State vs. Hamilton, 57 Iowa, 596;
State vs. Young, 105 Mo. 634; 3 Sackett 2844; State vs.
Horn, 12 Wyo. 85; Adams vs. People, 193 Ill. 405; State vs.
Cornish, 3 Wyo. 95; practically all of defendant's brief is
devoted to the sufficiency of the evidence; if the circum-
stances not absolutely essential, to the ultimate fact to be
proven, fail, the failure goes to the weight of the evidence
only; Ex parte Jefferies, (Okla.) 41 L. R. A. (NS) 749
and note; Clair et al. vs. People, 10th Pac. 799; State vs.
Novak (Iowa) 79 N. W. 475; Com. vs. People, 11th Am.
Dec. 155; Gunn vs. State, 78 N. E. 98; State vs. Furney, 21
Pac. 213; Ex Parte Hays, 118 Pac. 609; Lakey vs. State,
(Ark.) 55 S. W. 213; Thompkins vs. State, 32 Ala. 569;
Bressler vs. People, (Ill.) 3rd N. E. 521; it is sufficient if
the evidence produces moral certainty; 8 R. C. L. 225;
State vs. Gardner, supra; State vs. Cornish, supra; the jury
are the judges of the credibility of the witness and of the
weight of conflicting evidence; Phillips vs. Ter. 1 Wyo. 82;
State vs. Cornish, supra; Currant vs. State, 12 Wyo. 553;
Starks vs. State, 17 Wyo. 55; State vs. Cruskett, 118 Pac.
1047-1050; Konda vs. U. S. 166 Fed. 93; People vs. White,
90 Pac. 471; West vs. State, 68 So. 379; Lin vs. State, 127
N. W. 816; State vs. Moeller, 126 N. W. 568; rivalry involv-
ing the affections of a woman constituted the motive for the
crime; State vs. Beckner, (Mo.) 3 L. R. A. N. S. 535; Har-
vey vs. Ter., 65 Pac. 887; Ex Parte Harkins, 124 Pac. 940;
defendant made threats against deceased. As the case rests
on circumstantial evidence, it is necessary to enter upon a

more extended discussion of the facts than would be proper in an ordinary case, but the conviction is within the required rules; State vs. Jenkins, 22 Wyo. 34.

BLUME, Justice.

Albert Lampitt, the plaintiff in error, hereinafter referred to as the defendant, was convicted by a jury of murder in the first degree without capital punishment, for causing the death of one Harry Foight. Judgment was rendered on the verdict, confining the defendant in the penitentiary for life, and he brings the case here by proceedings in error.

The main error assigned in the case is that the verdict and judgment are not sustained by the evidence. It will, accordingly, be necessary to review the testimony. On account of the gravity of the case, we have carefully gone over the record. It covers well over one thousand typewritten pages, and in order to retain this opinion within reasonable compass, it will only be possible to give a brief outline of the testimony, but it must not be thought that we have not given careful consideration to all the facts and circumstances in this case, though, perhaps, not specifically mentioned herein. The jury were warranted in finding the facts hereinafter mentioned, though the testimony on some of the points was conflicting.

The death of Harry Foight occurred in an explosion at Grass Creek, an oil field situated on a stream called Grass Creek, in Hot Springs County, about 28 miles west of the town of Kirby, in this state, where the Ohio Oil Company maintains an oil and gas camp. The deceased was sleeping in a bunk house of said company at the time of his death. This bunk house was a frame building, well constructed, 12 feet wide from east to west, and 40 feet long from north to south. It was divided into six compartments, numbered one to six inclusively, from north to south. The deceased occupied compartment No. 1; that is to say, the compartment at the north end of the build-

ing. Worley Seaton occupied the room next to him. The
bunk house stood on a slope, higher in the east and north
than in the west and south. It rested upon a foundation
of concrete 8 inches in width, reinforced at the corners,
approximately one foot high on the west and about three
or four feet high on the east. There was an opening in
the foundation, for the purpose of entering the vacant
space under the building, at both the north as well as the
sound end, that at the north end being about 2 feet wide
and about 2½ feet high, and that at the south end some-
what smaller, both openings being about in the center east
and west. It was possible for a man to go under the build-
ing by either of these entries, and if desired, enter at one
end and come out of the other. The bunk house was
heated by a steam plant, with two-inch pipes running
north and south under the building and thence into the
various rooms. It was lighted by natural gas, three-
eighth inch gas pipes running under the foundation and
thence upward into each room, each of which was provid-
ed with a ventilator for the escape of gas. There were
also other gas pipes, two inches in diameter, under the
house. These had formerly been used in order to heat the
building with gas. But this method of heating had been
abandoned some two years prior to the explosion and the
gas pipes used in connection therewith had been plugged.
Each room in the bunk house had an ordinary board floor,
a door on the west and a window on the east. Immediate-
ly to the south and southwest of this building were several
more bunk houses; immediately to the north stood three
small houses, the nearest 38 feet distant, and close to these
buildings on the north and west were a meat house, dining
room and bungalow. The field, particularly in a north-
westerly direction from the bunk house in question, for a
distance of a mile or more, was dotted with homes, oil
rigs and other structures and buildings, including a post-
office, pool room and store, situated about a fourth of a

mile northwest of the bunk house in question. The explosion referred to occurred about one o'clock on the morning of May 7, 1921. It and the fire succeeding it, almost completely demolished the bunk house in question, killed Foight, the deceased, and Worley Seaton, and injured the other occupants of the building. For about five feet each way from the northeast corner of the bunk house, the foundation was completely broken and part of it ground almost to dust. The rest of the foundation, while injured and broken, was not destroyed to the same extent. The entire north end of the bunk house was blown to pieces and many splinters and other fragments were scattered about in the neighborhood within a circumference of 300 feet away. Some of the debris fell on the roofs of the adjacent buildings, a distance of 100 feet away. A nail was driven clear through the south and the north walls of the adjoining home, 38 feet to the north of the bunk house. A barrel standing on the porch thereof was cut in two. The porch was wrecked. A steel trunk in the compartment occupied by the deceased was broken to pieces. People in the immediate vicinity of the scene of the explosion were thrown from their beds. Fuse was found, as hereinafter mentioned, in the early morning of May 7th; the powder magazine, situated about one-half mile west of the bunk house, was found to have been rifled; suspicion, on account of other matters hereinafter referred to, centered on the defendant, and he was arrested at about 8:30 of the forenoon of that day as the party suspected to be guilty of causing the explosion.

1. It is the contention of the state that dynamite or niroglycerin or both were planted by defendant under the building, at the northeast corner thereof, and exploded by means of a fuse used by the defendant for that purpose. The defendant, on the other hand, contends that there was a leakage of gas from the plugged-up gas pipe hereinbefore mentioned, which exploded accidentally at a time

of low atmospheric conditions. And the first question, therefore, to be determined is as to what sort of explosion took place. Much testimony was introduced on this point by both sides, and the main controversy centers around (1) the finding of fuse, (2) the character of the burns on the persons killed and injured, and (3) the character and effect of the explosion in general.

(a) A number of witnesses testified to finding several pieces of burned fuse used for exploding dynamite or nitroglycerin, and that they were found at and closely about the bunk house soon after dawn of the morning of May 7, 1921. The total amount of fuse found was about seven feet in length, though there is some discrepancy in the testimony on that point, to which we shall refer later. The defendant introduced evidence tending to show that an explosion, such as hereinbefore mentioned, would blow any fuse, used in connection with it, into such pieces that it could not be recognized after the explosion. Testimony, however, on the part of the state was to the contrary. The witness Bankson, with large experience in handling dynamite, stated that it was not impossible to find fuse after such an explosion. The witnesses that testified to the finding of the fuse were, so far as we are able to tell, entitled to credence, and there is nothing in the record to indicate that anyone deliberately placed any used fuse in and about the ruins for the purpose of manufacturing evidence, and it would only be upon that theory that the testimony of these witnesses could be rejected. Two witnesses on behalf of defendant testified that the several pieces of used fuse, found upon the ground and introduced in evidence, are not of the same brand. We have the fuse before us and have examined it. So far as we are able to discover, it is of one kind. Some pieces appear to be lighter in color than others, but that is apparently due to dried mud thereon. The jury saw the fuse, no doubt examined it carefully, and came to the conclu-

sion that the testimony of defendant's witnesses was not correct, and we are not able to disturb that finding.

(b)   It appears from the record that there were so-called second and third degree burns—the later being fatal—on the right temple of the deceased; that his lungs were congested and had the appearance of being badly burned.   The entire body of Seaton was covered with burns of the third degree.   Some of the other occupants, too, were burned, but not fatally.   Witnesses for defendant testified that an explosion by dynamite or nitrogly-cerin does not generate heat, and does not cause burns. They related a number of instances of explosions by so-called 60 per cent dynamite, during which men were killed, without any burns upon them, however.   Counsel for defendant, accordingly, contend that the deep burns found upon the bodies of Foight and Seaton are consist-ent only with the theory that they were caused by an ex-plosion of gas, and not of dynamite or nitroglycerin.   The witness Bankson, however, testified that an explosion by dynamite or nitroglycerin generates heat.   In connection with this he stated:

"I couldn't tell you the degrees of heat that is in it but it is a tremendous heat that nitroglycerin makes from the explosion.   *  *  *   Yes sir, there is always a flash, always a flash.   You can see a flash from an explosion of nitro-glycerin.   Of course if it is a little dark you can see it much plainer than in daylight.   You know what I mean by that undoubtedly.   There is always a flash.   Might take a tea cup full of it and explode it and there would be a flash, there would be a flash of light."

Doctors Smith and Harris both testified from actual ex-perience that men killed by an explosion of dynamite had been burned.   The burns to which they testified were not, it is true, severe, due, perhaps, to the fact that the explo-

sions to which they testified were not as violent as the explosion shown in the case at bar, and to the fact that the explosive used in those cases was less powerful than the explosive used to destroy the bunk house in question. While the testimony of the state in this connection is not as satisfactory as might be wished, we are not able to say, in view of all the testimony on the subject of explosion, that there is not sufficient evidence in the record to warrant the conclusion of the jury on this point.

(c) The explosion was violent, and as the testimony tends to show, took place in the northeast corner of the building, right below where the deceased was sleeping. That corner of the bunk house was destroyed more than any other portion of the building. The witness Bankson, a man of forty years experience with nitroglycerin and dynamite, C. O. Rockwell, a man of twenty years like experience, and A. W. Peaks, also of considerably like experience, testified that the explosion in the case at bar was caused by dynamite or nitroglycerin or a combination of both; that an explosion by gas blows out the weakest point in a building, and that it would be impossible for a gas explosion to break a concrete foundation, let alone crumble part of it into dust, as shown by ample testimony to have been true in the case at bar. Bankson testified in part as follows:

"The gas explosions, what I have seen of them, they wreck the building but they don't tear it up first, just like putting pressure in here that strains the building at the weak places and lifts the roof up and blows the sides down and blows some of that away, but nitroglycerin will just clean that right up. You will see it laying in streaks, which ever way the most force was, see them laying over the ground, splinters that are not bigger than your finger. You don't see them out of any gas explosion I ever saw."

The witness Rockwell testified that the explosion in question was caused by a very high-power explosive, that

"it would be impossible to shatter that wall with natural gas or shatter the building to the extent that it did and throw the small particles as far as it did."

The testimony of the witness Peake is in part as follows:

"A. My opinion is that such an explosion could only be caused by high explosive. Q. What do you mean by "high explosive?" A. Dynamite, nitroglycerin or several other high explosives which I know nothing of except by hearsay. * * * My opinion is that such an explosion would have been impossible with natural gas. Q. I want you to answer whether or not it could have been possible for natural gas to have done that? A. Natural gas could not. Q. Why not? A. Because natural gas explosions do not have such a destructive effect. Q. What do you mean by that, in what way? A. They do not shatter concrete, throw debris such distances or jar the surrounding territory to the extent you stated. Q. What about the extent to which it may destroy the framework of a building? A. It does not shatter or splinter the framework. Q. You say this from what you say about the result of natural gas explosions? A. Yes, sir."

The testimony further shows that gas explosions take place only when there is a particular mixture of gas and air; if there is either too much air or too little, no explosion can take place. In this connection it was shown that there was a ventilator in each of the compartments of the bunk house in question, which permitted all air and gas to escape to the roof; further that the door of the decedent was open to permit his dog to come in or go out —this evidence having a tendency to show that the ex-

plosion did not take place in decedent's compartment.
In fact counsel for defendant do not appear to make any
claim of any gas explosion therein, but seem to contend
that it took place by reason of the accummulation of gas
that oozed out of the plugged gas pipe underneath the
building. But there was, as already stated, an opening in
the foundation both in the north as well as the south, the
former being approximately 2½ feet by 2 feet, an opening
sufficient to let considerable gas escape, and having a
tendency to show that a gas explosion under the founda-
tion was not likely. We are unable to say whether or not
the fact, called to our attention, that the pipe under the
building and a clock and other things found in the ruins
were not materially injured, and the fact that the earth
underneath had been little disturbed, are facts of impor-
tance in this case. In any event they were before the
jury and doubtless were taken into consideration by them.
The witnesses for the state, who testified that the explo-
sion was one of dynamite or glycerin, and not of gas,
were unequivocal in their statements; they were men of
experience and apparently entitled to credence. Whether
the explosion was of one kind or the other is mainly a
scientific fact, apparently—which is surprising—not yet
beyond the pale of controversy, but accepting the testi-
mony of the state in the case, which, under the circum-
stances, we must do, we are bound to say that there was
ample evidence for the conclusion arrived at by the jury.
We might say in passing, though possibly of no bearing
whatever here, that, even though the results of the ex-
plosion in question, including the burning of the bodies
of Foight and Seaton, might have been brought about
either by an explosion of gas on the one hand, or of dyna-
mite and nitroglycerin on the other, the jury, in view
of the finding of fuse on the scene and the easy escape of
gas, would still have been justified, we think, in conclud-
ing, as it did, that the explosion was of the latter kind.

2. We accordingly turn to investigate as to whether or not the defendant is the person properly found to be guilty of planting the dynamite or glycerin or both under the bunk house and of causing the explosion.

(a) In that connection the state attempted, in the first place, to show the defendant's motive for killing the deceased, namely the jealousy engendered in him by reason of the relations of one Grace Lee, a divorced woman, and the deceased, and the desire for revenge arising out of and in connection with such relations. The evidence tends to show that the defendant met Mrs. Lee in the spring of 1920, while she was working in a restaurant at Cody. In June of that year they took a trip together from Basin to Thermopolis, where they stayed two days in the same rooming house. They were driving alone in defendant's automobile. From Thermopolis they went to Worland, and spent two nights in the Dorman hotel at that place. They spent three nights in the same hotel at Basin. After leaving Basin they went to Powell, where Mrs. Lee worked at the Holmes hotel and where the defendant visited her from time to time. About the middle of July, 1920, Mrs. Lee and a man by the name of Wainscott, a gentleman over seventy years of age, arranged for a trip through Yellowstone Park, with the defendant as their guide. After the third day, Mr. Wainscott suddenly quit them and the defendant and Mrs. Lee continued on that trip for several days before returning. After their return their relations continued friendly. In September, 1920, Mrs. Lee obtained employment at Grass Creek as a chamber maid, taking care of the bunk houses of the Ohio Oil Company, including the bunk house in question. Soon after arriving in that field she wrote the defendant a letter, requesting him to come to see her, and also asking him to do some shopping for her. The defendant came to the field in the middle of October, 1920, engaging mainly in the repair of automobiles. His friendship for Mrs. Lee

continued and he called upon her at various times and took her out riding. But the fortunes of wooing are varied. Mrs. Lee had attracted the attention of Harry Foight, the deceased, and, according to the testimony in the record, they became engaged, which was commonly known in the camp of the Ohio Oil Company, and evidently a considerable amount of rivalry came to exist between Foight and the defendant over the affections of Mrs. Lee. The deceased, in order to overcome any fondness that Mrs. Lee might have for the defendant, told her that the defendant was reported to be crazy, that he was a sheep herder and that he had been in jail in Cody on the charge of having killed Dr. Ash. The defendant, so the state's evidence shows, although he denied it, was eavesdropping and heard these statements made by Foight. Thereupon trouble started. A number of witnesses testified that the defendant talked to them about these statements and wanted the witnesses to go to Mrs. Lee for the purpose of inducing her to acknowledge that these statements had been made by the deceased, in order to lay the foundations for a prosecution of, or a suit against, him. The various witnesses approached as aforesaid refused to comply with the defendant's request. This, according to the testimony, angered the defendant and apparently caused him to brood over the situation. The witness Osborn stated that when he refused to go to Mrs. Lee with the defendant, the latter stated: "There isn't anybody can say those things about me and get away with it," and that he was angry at the time. The witness Craig testified that defendant told him: "Well, if you will not go, I will get him sooner or later." The witness Dustin stated that about Christmas time the defendant said: "If I ever hit him, I will try to kill him." The witness Harry Lee testified that in February, 1921, the defendant stated: "I am not through with him. I am going to have some fun with him." Reference in each instance was to the deceased. What aggravated the situa-

tion, perhaps, was the interference on the part of one A. J. Kelly, who apparently had heard some of the talk of defendant about the deceased, and who told the defendant that if he did not desist from his conduct, he would be driven out of the camp. Kelly testified that the defendant stated to him: "I will kill both you and Foight." In the latter part of April, defendant went to H. C. Lavelle, requesting the latter to go with him to have a settlement with Foight, and on May 4th, just prior to the explosion in question, he still expressed hatred and anger of Kelly and Foight to the witness Dustin.

(b)  On or about the 21st day of April, 1921, the defendant was in Cody, in this state, and at that time bought from the Cody Mercantile Company fuse such as is used for exploding dynamite or nitroglycerin. He admits this fact and claims that he left the fuse at Cody, but the jury evidently disregarded his testimony on this point. While there is some inconsistency in the statements as to the number of feet of fuse bought by the defendant, the jury were justified by the testimony of Mr. Murray, without setting out the details thereof, in finding that the number of feet of fuse sold to the defendant at Cody was approxi-. mately the number of feet of fuse now claimed by the state to have been found at the ruins at the bunk house and introduced in evidence in this case, namely about 7 feet in length. We have heretofore stated that there is a discrepancy in the testimony of the state as to the number of feet of burned fuse so found. The coroner stated that, according to measurements made in his presence, the amount turned over to him on the morning of May 7, 1921, and claimed to have been found, measured something like 15 feet in length. The point is of vital importance, for the fact, if it be a fact, that defendant bought fuse of the length found to have been used to bring about the explosion, is, in connection with the motive hereinbefore mentioned, perhaps the most important link in

establishing, or aiding in establishing, the defendant's connection with the murder of Foight. The coroner turned the fuse over to the sheriff of Hot Springs county, and counsel for defendant charge that the latter and the county attorney willfully discarded some of it, and produced at the trial only enough so as to correspond, roughly, with the number of feet testified by Murray to have been sold to defendant at Cody. The charge is grave and in view of the coroner's testimony, merits attention. Fifteen feet of fuse was bought by said sheriff at Cody on May 13, 1921. The testimony shows that it was the same kind as that sold to defendant. It was introduced in evidence, evidently for the purpose of comparison. Whether or not the coroner might not have had this fuse in mind, we do not know. The measurement testified to by the coroner was not made by himself. Whether it was made carefully or not, and the method thereof, does not appear. The strands of the fuse are considerably separated and might lead to an error in computation. In any event, the sheriff was upon the witness stand and testified that the total amount of fuse turned over to him by the coroner was produced at the trial and introduced in evidence in the case. The jury saw the witnesses. They were better judges of the fact whether the sheriff told the truth or not than we could possibly be by reading the record before us, and we cannot see how we are justified in drawing a conclusion contrary to that evidently arrived at by the jury, namely that the coroner was mistaken as to the number of feet.

(c)	The state introduced evidence intended to show that the explosives, claimed to have been used by defendant in blowing up the bunk house, were either brought by defendant from Cody, or stolen by him from a powder magazine in Grass Creek, situated, as heretofore stated, about one-half mile west of the bunk house in question, in charge of A. J. Bankson. There was some testimony

to the effect that some dynamite in a garage, rented by defendant at Cody, disappeared under suspicious circumstances, about the 21st of April, 1921, and was discovered to be gone shortly after the defendant had been there. The state appears, however, to rely more upon the theory that the explosion was brought about by defendant by means of nitroglycerin and dynamite stolen by him from the power house in question, on the evening of May 6, 1921. In support of this theory it was shown that defendant had experience in the handling of fuse and dynamite—a fact not disputed by defendant. It was also shown that he forced a lock open on one of the doors of the bunk house in question, with chisel and hammer, a few days prior to the explosion in question. This testimony was produced for the purpose of showing that the defendant knew how to open the lock of the door of the powder magazine, which, as hereinafter mentioned, was found to have been forced open. The testimony of the state also shows that about ten days before the explosion in question, the defendant, who lived close to Mr. Bankson, asked permission of the latter to go with him to the powder magazine. Such permission was granted, and the defendant, upon arrival there, asked about the nitroglycerin and dynamite therein. Bankson had another talk with the defendant in a barber shop on May 4, 1921. The conversation again was about dynamite and solidified nitroglycerin. The defendant asked Bankson to explain the difference in the explosive power of so-called 60 per cent dynamite, and so-called 100 per cent solidified nitroglycerin. Bankson answered that the latter had considerably more force and power than the former. The conversation further related to the time within which dynamite or nitroglycerin respectively would explode, and Bankson explained that in order to make an explosion certain, it would be advisable to tie sticks of dynamite and nitroglycerin together; that the fuse would first explode the dynamite and that the dynamite would then be

certain to cause the explosion also of the nitroglycerin. This point will be referred to again. Bankson, who, as heretofore stated, kept and was in control of the powder magazine heretofore mentioned, visited it about 6:30 in the evening of May 6, 1921. He and some other parties, suspecting that the explosion during that night had been caused by other than gas, visited the magazine about 7:30 in the forenoon of May 7th. They found that the door thereof had been broken open and was standing ajar about two or three feet; that the door stop had been removed and that the door showed evidences of having been opened by a bar. The window, too, of that building, according to some of the testimony in the record, showed evidences of an attempt to open it with an iron bar. The dynamite and nitroglycerin in the building had been tampered with and, according to the testimony of Mr. Bankson, about 15 sticks of nitroglycerin, weighing 30 pounds, and 16 sticks of dynamite, weighing 8 pounds, or a total of 38 pounds of nitroglycerin and dynamite had been taken therefrom during that night. The defendant at that time was in possession of two iron bars, one of them found in the early morning of May 7th in his automobile, which was wet, indicating that it had been used and moistened by the rain during the night; one of them was taken from the automobile somewhat later. Some of the testimony tends to show that these bars fitted into the marks made on the door and window of the powder house respectively; that these marks were clearly discernible on the morning of May 7, 1921; that they were, however, somewhat obliterated after the wood on the door and window had dried. Not to exceed three or four sticks of nitroglycerin and a few sticks of dynamite, or, in other words, only a small portion of the 38 pounds taken from the powder magazine is shown to have been used in causing the explosion in question. Some dynamite and nitroglycerin, thought to be a part of that taken from the powder magazine, was found under what is called the dog house; and explosives

of the same kind were later found in another part of the field. Counsel for defendant contend that inasmuch as defendant had experience in the handling of dynamite and knew that it would take only a few stick of nitroglycerin to cause an explosion of the kind in question here, it is absurd to think that he took 30 pounds of nitroglycerin and 8 pounds of dynamite from the powder magazine, and that he then used only a portion of it, and deposited or hid the remainder at several places in the Grass Creek field. There is force in this contention, but it is, we think, a point to be argued to the jury, rather than to this court, for it is by no means clear that a man so depraved as to plan and scheme a murder under circumstances disclosed in the case at bar, might not, in his evil cunning, do what is shown to have been done here, for the very purpose of covering up his tracks by a method which he, at least, might think to be good.

(d) We have heretofore stated that Bankson, in his talk with defendant in the barber shop, mentioned the fact that it would be advisable, in order to insure the explosion of nitroglycerin, to tie some dynamite to it. It is the theory of the state that this was done in order to cause the explosion in question. We have already referred to the finding of some of these explosives under the dog house. It was found in a sack, which also contained a red string, part of which, the state believes, was used to tie together the dynamite and nitroglycerin which caused the explosion. To trace that string to the possession of defendant, testimony was introduced to the effect that this sort of string was shipped into Grass Creek with so-called Empire bacon, and was frequently used by the store keeper there to tie up parcels of bacon sold by him. It is further shown that merchandise, including bacon, was bought by the defendant in the store in question shortly before the explosion, and part of this bacon was found in the possession of the defendant shortly after the 7th

day of May. While the circumstance here related is, perhaps, not of any convincing nature, standing by itself, the jury had a right to take it into consideration.

(e)   It further appears that the defendant was familiar with the bunk house, the various rooms therein, and as to who occupied them, for he helped to clean them not only in December, 1920, but also a few days prior to May 7, 1921. Again it appears that Seaton, who occupied the compartment next to Foight, planned to go to town on the evening of May 6, 1921, and that defendant heard the conversation relating to that trip. Testimony to that effect was introduced for the purpose of showing that the defendant considered the night while Seaton would be absent, the most opportune time for killing Foight, inasmuch as he had no motive to kill the former.

Summarizing, then, the facts stated, with mention of a few additional, but not all of the circumstances shown by the state, we have here a case in which jealousy and a desire to be revenged for real or fancied injuries, were shown to be the motives on the part of the defendant for the commission of the crime with which he stands charged, and that these may be potent motives for homicide is recognized by the authorities. Underhill on Criminal Evidence, (3rd ed.) sec. 503; Wigmore on Evidence, (2nd ed.) secs. 105, 118. The defendant purchased fuse in Cody. If we are to believe the evidence of the state, fuse of approximately the length purchased by him was found upon the scene of the explosion—a circumstance tending to show that the fuse purchased was the fuse found. The defendant was familiar with the bunk house, the opening under it, the room in which the deceased was sleeping; reason had been given him to believe that Seaton, the occupant of the next compartment in the bunk house, would be absent on the night of the explosion, making it less likely to kill or injure any other person in the bunk house, by planting the dynamite and nitroglycerin in the north-

east corner thereof. The powder magazine in the Grass
Creek field was robbed during the night of the explosion.
If the evidence of the state is to be credited, the inference
was justified that the defendant knew how to open the
lock thereon; that he was the man who attempted to open
its window and who succeeded in opening its door; that
he had taken pains to go and examine the powder maga-
zine and note the location of the dynamite and the nitro-
glycerin. Experienced though he was in the handling of
dynamite, he, according to the testimony, gathered infor-
mation, not alone at the time when he went with Bankson
to the powder magazine, but on another occasion as well,
to find out the difference between 60 per cent dynamite
and 100 per cent nitroglycerin. There was testimony
tending to show that he was indifferent when he saw the
dead bodies of Seaton and Foight, though he knew them
well, and that on his trip to jail he stated, apparently
with stolid indifference, that he had been in a mess of
that sort before, but that no one "got anything on him."
The jury had the various witnesses in the case before
them and heard their testimony. They were much more
able to judge of their credibility than we are. The de-
fendant had denied that he bought the fuse, but admitted
it when on the witness stand. The jury saw and heard
him testify. Whether or not he was entitled to credence
and gave a reasonable explanation of his actions and his
whereabouts, could be better determined by them than
by us, and we are not able to say that they were not justi-
fied in finding that every fact essential to be shown was
established beyond a reasonable doubt and that the evi-
dence in the case led irresistably to the conclusion that
the defendant was guilty. Many of the circumstances in
the case, standing by themselves, would not be of impor-
tance, but when all are taken together, each given its
proper weight, they were sufficient, we think, in authoriz-
ing the jury in returning its verdict. Circumstantial evi-

dence is not like a chain which falls when its weakest link is broken, but is like a cable. The strength of the cable, as stated in Ex parte Hayes, 6 Okla. Crim. 333, 118 Pac. 614:

"does not depend upon one strand, but is made up of a union and combination of the strength of all its strands. No one wire in the cable that supports the suspension bridge across Niagara Falls could stand much weight, but when these different strands are all combined together, they support a structure which is capable of sustaining the weight of the heaviet engines and trains. We therefore think that it is erroneous to speak of circumstantial evidence as depending on links, for the truth is that in cases of circumstantial evidence. each fact relied upon is simply considered as one of the strands and all of the facts relied upon should be treated as a cable."

Horn v. State, 12 Wyo. 80, 154, 155; 16 C. J. 766, 767.

3. The defendant offered to show the presence and movements of an automobile in the vicinity of Grass Creek a few minutes before the explosion, and the presence and movements of another automobile in the same neighborhood soon after the explosion. The offer was refused, and this ruling of the court is assigned as error. No offer was made to connect up such facts with other facts tending to show in any way that the occupants of these cars had anything whatever to do with the explosion. The offered testimony could, accordingly, have no other effect than to raise a possible suspicion that the person or persons in these cars might have had something to do with the crime for which defendant was tried, and comes accordingly clearly within the rule laid down in Horn v. State, 12 Wyo. 80, where it was held that testimony, offered by a defendant on trial for murder which would merely have generated a suspicion that some other

person might have committed the crime, is properly excluded.

4. The witness Craig testified to a conversation which he had with the defendant in December, 1920, concerning the trouble between defendant and the deceased, and the witness stated that the defendant was angry at that time. It is claimed that such testimony was too remote. But remoteness does not affect the competency of the testimony and goes only to the weight thereof. Durham v. State, 29 Wyo. 85, 93; 210 Pac. 935. The same claim of remoteness is made as to the testimony of the witness Dustin, when he stated that he saw the defendant open a lock some ten days previous to May 7, 1921. Even though this testimony was remote, it was not error to admit it.

5. The witness Hazen and Jones testified on behalf of the defendant, and made certain experiments with so-called 60 per cent dynamite, in order to show the effect of an explosion thereof. The court did not permit them to testify what they found as the result of the experiment, and this is assigned as error. It is claimed that the experiments showed that no heat was generated, no burns or scorching resulted and that no fuse could be found thereafter. The experiment was made, as stated, with so-called 60 per cent dynamite, 15½ pounds being used, for the purpose of blowing up a "one story shack" of three rooms, boarded and floored, covered on the outside with tar paper. The dynamite was placed in gunny-sacks, deposited on planks or boards, covered over with deer skin, and two more gunny-sacks laid on top of that. A fuse 7 feet long was attached to one of the sticks of dynamite. The testimony as to the results of this experiment was excluded for the reason that the conditions under which the experiment was made, were not shown to have been the same as the conditions under which the explosion in question here took place. Exact similarity should, of

course, not be required, to permit testimony of experiments of this kind. The rule is that there must be similarity in such circumstances and conditions as might supposedly affect the result in question. Wigmore on Evidence, (2nd ed.) sec. 442. The points here to be answered were (a) does an explosion of dynamite of 60 per cent or of nitroglycerin of 100 per cent generate heat and cause burns or scorchings of the bodies affected by the explosion, and (b) is the effect thereof such that no fuse used therein can be found thereafter? Did, accordingly, the experiment made as aforesaid, have a reasonable tendency to answer these questions correctly? It was said in Chicago etc. R. Co. v. Champion, 9 Ind. App. 510, 32 N. E. 874, 23 L. R. A. 861, that evidence of such tests should be received with caution, and only admitted where it is obvious to the court from the nature of the experiments that the jury will be enlightened rather than confused. Whether or not the result of the experiment here mentioned should have been permitted to have been shown, is a point that is doubtful. The question has, however, been barely stated in the briefs of counsel for defendant. For that reason we prefer not to decide it and do not think it necessary to do so. The testimony of the making of the experiment was before the jury. Both Hazen and Jones testified as experts in the case, claiming to have had considerable experience with dynamite. Both testified that no burns on human or other bodies would be caused by an explosion thereof and that fuse would be so cut to pieces that it would be unrecognizable. Hazen, for instance, testified:

"Q. All right, Mr. Hazen, you may state, if you know, whether high explosives will burn at the time of ignition of the explosion? A. It has been my experience that they will not. * * * Q. Was there any burns upon the body or upon the person? (of the persons killed in such explosion). A. No, sir. * * * Q. Could there have been any fuse at all around the scene of the explosion?

A.  I would say, no.  Q.  Why?  A.  The force of the
explosion would have thrown this fuse so far and in such
small particles that it would very likely be a lucky thing
if it ever was found.''

It is apparent, therefore, that the experiment hereto-
fore mentioned, would simply be one additional instance
verifying the knowledge that the witnesses already pro-
fessed to have, and when they testified as hereinbefore
stated, they in effect testified to the result of the experi-
ment they made in the same manner as they testified to
the result of the other cases of explosions which they had
seen, for their knowledge was gathered from all their
experience, including the experience gained from the ex-
periment.  Hence, even though it was error to exclude
the testimony mentioned, we cannot consider it as an error
that, under the circumstances of this case, was prejudicial.

6.  The trial of this case commenced January 30, 1922.
Just previous thereto, on that date, the defendant filed a
motion for continuance on account of the absence of one
Carl Ardt, who was claimed to be an important witness
for defendant, and who was at that time in Oklahoma.
It was claimed that he would testify in substance that he
was present at the scene of the explosion on the early
morning of May 7, 1921, saw no fuse and would have seen
it if it had been there, and that he would further con-
tradict some of the testimony of Kelly and McNellis on
that subject.  No subpoena was issued for Arndt until
January 24, 1922, for the reason, as claimed, that defendant
relied upon the state to produce him as a witness.  The
defendant was arrested on May 7, 1921, and his trial in
the district court did not take place until nearly ten
months thereafter.  We think that under these circum-
stances, it was within the discretion of the trial court as
to whether to grant the continuance or not, and that it
committed no reversible error in denying it.  Keffer v.

State, 12 Wyo. 49, 73 Pac. 556; Durham v. State, 29 Wyo. 85, 210 Pac. 934.

These are all the points that are argued by counsel for defendant. After careful examination, we find no reversible error in the record, and the judgment in the court below should accordingly be affirmed. It is so ordered.

*Affirmed.*

POTTER, C. J., and KIMBALL, J., concur.