468 A.2d 353

**Allen Glenn FINKE**

v.

**STATE of Maryland.**

**No. 1804, Sept. Term, 1982.**

Court of Special Appeals of Maryland.

Dec. 8, 1983.

452

456

John L. Kopolow, Asst. Public Defender, with whom was Alan H. Murrell, Public Defender of Maryland on brief, for appellant.

Valerie V. Cloutier, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Maryland, Warren B. Duckett, Jr., State's Atty., Anne Arundel County and Gerald Anders, Deputy State's Atty., Anne Arundel County on brief, for appellee.

Argued before WILNER, BLOOM, MORTON, JAMES C., Jr. (Retired, specially assigned), JJ.

BLOOM, Judge.

Appellant, Allen Glenn Finke, was convicted by a jury in the Circuit Court for Anne Arundel County of felony murder. This court in an unreported per curiam opinion (*Finke v. State,* No. 899, September Term, 1980, decided June 1, 1981) reversed the conviction and remanded the case for a new trial because the lower court had failed to make a pre-trial determination on Finke's motion to suppress an inculpatory statement given by him to the police. Md.Rule 736f.

Appellant was retried in the same court and was again convicted by a jury of felony murder. On this appeal he asserts:

    I.   The evidence was insufficient to sustain the conviction for felony murder.

    II.   The trial court erred in denying appellant's motion to suppress his oral statements.

    III.   Appellant was denied due process of law when the trial court considered the accuracy of his oral admissions in denying his motion to suppress them.

    IV.   The trial court erred by receiving into evidence the extrajudicial statements given to police by State witness Donald Blevins.

    V.   The trial court erred by allowing the State to read to the jury, as part of its case-in-chief, the testimony appellant gave at his first trial.

VI. The trial judge erred in refusing to allow a defense psychiatric expert to give his opinion of the voluntariness of appellant's admissions.

VII. The trial court erred by admitting evidence of appellant's prior, unrelated criminal activity.

VIII. The trial court erred in denying appellant's request for a change in venue.

## FACTS

On Friday, June 8, 1979, the appellant's aunt, 61-year-old Leonette Shilling, was found stabbed to death in her home on Fort Smallwood Road in Riviera Beach. Mrs. Shilling's body was discovered by her husband, Calvin S. Shilling, when he returned to the home some time after 2 p.m.[1] She had been stabbed twelve times in the neck, back, chest, and hand. Several of the wounds, which varied in depth from one to three inches, were lethal. It appeared that Mrs. Shilling had been taking a nap immediately prior to being attacked. There were blankets on the living room couch, her bedroom slippers were beside the couch, and her three-year-old grandson, Michael Somerfield, for whom she was babysitting, was found asleep and unharmed on the couch. Evidently Mrs. Shilling was murdered only a short time before her husband arrived home. One of the Shillings' married daughters, Patricia Sayers, testified that she had talked with her mother by telephone from 1:40 to approximately 1:50 to 1:55 p.m. and that there was no indication that anyone other than the grandson was in the house with her mother at the time. When Mr. Shilling returned to the house, he found the front door unlocked and ajar. He testified that this door was kept locked and was rarely used, as the family and visitors customarily entered the house through the kitchen door located at the side of the house.

---

1. Mr. Shilling was not certain of the exact time he arrived home. He testified that upon discovering his wife's body he immediately called for an ambulance. The fireman who responded testified that they were dispatched at 2:28 p.m.

He also testified that he and his wife had planned to leave June 6 for a five day trip to Las Vegas but that the trip had been postponed at the last moment. The Shillings owned two cars, a Lincoln Continental and a Chevrolet. Mr. Shilling testified that when he and his wife traveled they drove the Lincoln to the airport and left the Chevrolet parked beside the house. Generally, Shilling drove the Chevrolet to work; but on the morning of the murder he drove the Lincoln, leaving the Chevrolet parked beside the house. Although there were substantial sums of money in various locations in the house, including money on top of a dresser in the bedroom, it appeared that no money or anything of value had been taken.

The evidence that implicated appellant in the murder came principally from two sources: (1) the testimony of Donald Blevins, his friend and roommate, and (2) the statements and admissions which the appellant made during police interrogation, as related by the officers who conducted the interrogation.

Blevins, age 24, testified that he and the appellant, age 26, had been friends for many years. They lived together, sharing a house with Blevins' brother and sister-in-law, and worked together as carpenters for a construction company. On the night before the murder, the two had been out until very late, drinking and playing pool at a bar, and had arrived home at approximately 4 a.m. Suffering the effects of their activities of the previous night, Blevins and the appellant overslept and did not report for work. Blevins testified that they arose around noon, dressed, and then drove in his truck to the Three B's Bakery where they had breakfast. Afterwards, they drove around the neighborhood, visiting various acquaintances in an attempt to obtain some marijuana. Blevins indicated that in doing so they passed by the Shilling house at least once. Unable to locate a marijuana source, the two then drove to the parking lot of the Acme grocery store on Fort Smallwood Road, which is located behind and to one side of the Shilling house. There Blevins, who was driving, parked the truck in a space facing in the general direction of, and 200 to 300 feet from, the rear

of the Shilling house. Blevins said they arrived there between 1:30 and 2:30 p.m.; he also claimed that he did not recall why they had driven to the parking lot or whose idea it was to do so. After they had been there for a few minutes, Blevins testified, the appellant, without saying where he was going, climbed out of the cab and walked towards the front of the truck. Blevins claimed that he did not observe where the appellant went because his view was blocked by the newspaper he was reading. Approximately 10 minutes later the appellant returned, saying only, "let's go," and they then drove from the Acme lot to the home of appellant's father. There they spent the remainder of the afternoon working on appellant's Ford van, which was inoperable, preparing to rebuild the engine. Blevins testified that the appellant had bought the van, which had broken down a month prior to the murder, with money borrowed from the appellant's father and that the appellant did not then have the money to pay for the repairs. Blevins also testified that he and the appellant each owed one Russell Sikorski $30 for marijuana.[2] Finally, Blevins testified that the appellant owned a penknife with a blade 3 inches in length and approximately ½ inch in width and that he believed the appellant had been wearing cut-off jeans on the day of the murder.

Joseph Folio, a clerk at the Acme grocery store, identified photographs of the appellant and Blevins as being those of two men he found in the men's room of the store some time before noon with a pie taken from the store shelves. He did not report the incident to police until after he learned that an arrest had been made in the Shilling homicide. John Williams Simpson, Jr., the manager of the clothing store located directly behind the Shilling house, testified that he observed Blevins' truck parked in the space identified by

---

2. That evening, after Blevins and the appellant had received and cashed their paychecks for the week, the appellant paid Sikorski. Blevins recalled that his check was for approximately $100 and the appellant's was for $70. The appellant indicated that his check had been for $176.

Blevins some time between noon and 2 p.m. on the afternoon of the murder.

The appellant was first questioned by police concerning the killing one month after it occurred. On the afternoon of July 10, 1979, Detective Thomas Mock of the Anne Arundel County Police went to the appellant's residence and asked the appellant to accompany him to the Millersville Station for questioning. The appellant at first demurred, saying that he was scheduled to play baseball that evening but agreed when Mock told him that the questioning would not take long and that after the interview Mock would drive him to the game. After arriving at the station at 6:40 p.m., the appellant was turned over to Detective James Moore, who was in charge of the investigation into the Shilling murder. Detective Moore informed the appellant of his *Miranda* rights and told him that he was not under arrest and could leave at any time. The appellant was then asked to describe his activities on the date of the murder. He said that he had been out late the night before; that he and Blevins had slept in that morning; that he had awakened, dressed and driven around looking for marijuana;[3] that they had had breakfast at the bakery from 1:30 to 2:30 p.m.; and that afterwards they had driven to his father's house to work on his van. He also said that they passed by the Shilling house two or three times while looking for marijuana and that, although he had spent considerable time there when he was younger, he had not been in his aunt's house for more than a year and a half. The questioning continued throughout the evening with the appellant indicating that he was unable to remember all the events of the day in question. Sergeant Richard Davis said he questioned appellant alone from about 9:45 p.m. to 11:50 p.m. on July 10, 1979, at the Millersville station.[4] During

---

3. Appellant admitted using a wide variety of drugs in the past, including heroin, LSD and PCP. At the time he was questioned, he was using marijuana and alcohol on a daily basis.

4. Davis administered two polygraph examinations, but this was not mentioned at trial.

this interrogation appellant repeated the recitation of what he had done on June 8 and denied that he had been in the Shilling house or that he had any personal knowledge of or involvement in the murder. In an attempt to aid his recall, it was suggested that the appellant undergo hypnosis. He agreed and a hypnotist, Dr. Richard Ittner, was brought to the station. During the hour-long session which followed, however, Ittner was unable to hypnotize the appellant, and he merely repeated the account of his activities which he had given earlier. Around midnight the appellant was taken into the hallway of the station and seated on a bench. The interrogation recommenced with Moore telling the appellant that the police knew that he was the killer and asking him to recall what had happened. The appellant replied that he could not. The appellant was also told by police that witnesses had seen him enter and leave the Shilling house, that his fingerprints had been found at the scene, that Michael Somerfield had identified him as the killer, and that two people had called the Shilling house around the time of the murder and would identify him as the person who had answered the phone. All of these statements were false. Thereafter, appellant was interrogated intermittently by Detectives Moore, March and Mock. Lieutenant Jerome Bozek listened to portions of the interrogation but did not participate in the questioning.

While being questioned by Detective Mock and after he and Mock had discussed religion and the religious implications of murder and said an act of contrition together, appellant began to recall details which he had previously been unable to remember. He told Mock, "I must have been there. I must have done it, otherwise I couldn't—I wouldn't remember some of the things I remember." Then he said, "Well, I don't really remember anything but I'm trying to and I'm getting little flashbacks." When pressed by Detective Mock to relate those flashbacks, he said he remembered that on the day his aunt was killed he and Blevins had driven to the Acme parking lot and that he climbed out of the truck and walked away while Blevins was reading the paper. He recalled the driveway leading from the Acme

parking lot to the rear of the Shilling house along the back driveway, a pile of gravel and either a backhoe or frontloader behind the house. With reference to the Shilling garage, he recalled that it had two bays—the left bay was empty with the door open; the right bay door was closed and a small pump truck was parked in that bay. Appellant claimed that he was unable to remember actually entering the house but guessed his aunt answered the door or opened the door. When asked what he remembered about the interior, he described the kitchen table as covered with business papers and remembered seeing a stack of newspapers. Appellant recalled closing sheer curtains hanging at the kitchen window, the presence of clean dishes draining in the left side of the sink, a baby's bottle on the counter, frozen meat wrapped in clear plastic thawing on a plate to the right of the sink, and a child's toy on the kitchen floor. He also recalled that the television was on with the volume turned down very low and that clean clothes were lying on a bed in one of the bedrooms. He described these recollections as "flashes," images which appeared in his mind as he tried to remember. He said repeatedly that he couldn't recall actually killing his aunt but made numerous statements such as "I know I did it but I can't make myself tell you I did, I keep blanking it out" and "why do I recall these things if I wasn't in there, why don't you just go ahead and charge me?"

At approximately 4:00 a.m., the interrogation ceased.[5] Although the appellant was told to go home,[6] he refused to

---

5. The interrogation thus lasted for more than nine hours, commencing at 6:40 p.m. on July 10 and continuing intermittently until 4:00 a.m. on July 11. The officers testified that although they advised the appellant on several occasions that he was not under arrest and could leave if he wished he at no time indicated that he desired to do so. They also testified that appellant at no time indicated that he was tired or that he wanted food or sleep.

6. He was not arrested until two days later. At the time the appellant made the incriminating statements, Blevins, although he had been

do so, stating that he did not wish to leave until he was certain whether he had committed the murder. He was therefore given a blanket and allowed to sleep on a couch. Later that morning he consented to a search of his room in the house he shared with Blevins. During the search, officers seized two pairs of cut-off jeans, one of which was determined to be stained with human blood.[7]

The evidentiary value of the appellant's statements lay in the fact that every detail which he recalled corresponded to the scene described by the officers and firemen who arrived at the Shilling house immediately after the homicide. They testified that when they entered the house they found the television on with the volume turned down very low, the kitchen table covered with business papers and documents, a stack of newspapers, dishes draining on the left side of the sink, a baby's bottle on the counter, frozen crabs and crab cakes wrapped in clear plastic thawing on a plate to the right of the sink, closed sheer curtains at the kitchen window, a child's toy on the kitchen floor, and clean clothes lying on a bed in a bedroom. They also testified that they found cash and jewelry on top of a bedroom dresser. Outside of the house they found that the left bay door of the garage was open and the bay empty. They found a small pump truck parked in the right bay and the bay door closed. They also found a pile of gravel and a parked backhoe or frontloader behind the house. Every officer who questioned

---

questioned by police, had not yet admitted that he and the appellant had been on the Acme lot around the time of the murder.

**7.** Typing of the blood proved impossible. Blevins' sister-in-law testified that she did laundry for members of the household, including the appellant, at least once a week. The FBI analysis indicated that only a very poor washing would have failed to remove the blood stains. Several witnesses testified that the appellant habitually wore cut-off jeans at work and that on at least two occasions subsequent to the murder he injured himself at work and wiped the blood from his injured hand on his jeans.

the appellant was asked whether he had prompted the appellant or in any way described the crime scene to him; each stated that he had not.

The appellant also made an inculpatory statement to Charles F. Shilling, the victim's son, who visited the appellant at the County Detention Center two weeks after the arrest. He told Shilling that he remembered parking in the Acme lot and approaching the house from behind but said repeatedly that he was not sure whether he had committed the murder.

Appellant did not testify at the second trial. Over his objection his testimony at the first trial was admitted into evidence. During that testimony he had repeated the story he had originally told the police when he was questioned on July 10, claiming that he and Blevins had been eating breakfast at the bakery from 1:30 to 2:30 p.m. on June 8 and that they had driven directly from there to his father's home. He had explained that the details he described to police concerning the Shilling house had merely been suppositions on his part based on what he remembered about the house and the Shillings' habits from the time he had spent in their house when he was younger. He had stated that he was certain that he had not killed his aunt, although conceding he had not been certain when questioned by police on the night of July 10–11. He had explained that he did not think the police would lie to him about what evidence they possessed and, therefore, he felt he must be guilty. On cross-examination he had denied that he had ever been in the Acme store located behind the Shilling house and had denied he had been in the Acme parking lot on the afternoon of the murder.

## I.  SUFFICIENCY OF THE EVIDENCE

The State's sole response to appellant's argument that the evidence was insufficient to sustain his conviction is an

assertion that our determination on the prior appeal that the evidence was sufficient to justify remanding the case for a new trial "is the law of the case." We flatly reject that proposition. Even if it were reasonably practical to do so, we would not be disposed to re-examine and review the entire record of the first trial and compare it with the record of the second trial to determine if the evidence was precisely the same at both trials. Consequently, a determination that the evidence adduced at the first trial was sufficient to sustain a conviction could not possibly be binding, as the law of the case, in the second trial.

■■■ In determining whether the evidence was sufficient to sustain appellant's conviction, we must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). *See also, State v. Rusk,* 289 Md. 230, 240, 424 A.2d 720 (1981). Appellant was convicted of felony murder, the elements of which are the commission of an underlying felony and a death occurring during the perpetration of that felony. *State v. Frye,* 283 Md. 709, 713, 393 A.2d 1372 (1978); *Newton v. State,* 280 Md. 260, 269, 373 A.2d 262 (1977). The only underlying felony was statutory daytime housebreaking, Md.Ann.Code Art. 27, § 30(b), which provides:

Any person, his aiders, abettors and counsellors, who shall be convicted of the crime of breaking a dwelling house in the daytime with intent to commit murder or felony therein, or with intent to steal, take or carry away the personal goods of another of any value therefrom, shall be guilty of a felony, and upon conviction thereof shall be sentenced to the penitentiary for not more than ten years.

Appellant does not challenge the sufficiency of the evidence to support the jury's finding that he killed his aunt. He asseverates that there was insufficient evidence of both

the breaking and the intent elements of the underlying felony.

The breaking of a dwelling house or other structure, within the meaning of that term as applied to burglary and related statutory crimes, may be actual, as where physical force is applied, or constructive, as where entry is gained through fraud or trickery. It may involve simply lifting a latch or opening a door closed by its own weight. *Jones v. State,* 2 Md.App. 356, 360, 234 A.2d 625 (1967); *Reagan v. State,* 2 Md.App. 262, 267–68, 234 A.2d 278 (1967). Turning a doorknob and opening a closed door or merely further opening a door left ajar involves sufficient force to constitute an actual breaking, provided it is a trespassory act. "There is no 'breaking' if a person has a right to enter or if he enters with the consent of the owner." *Martin v. State,* 10 Md.App. 274, 279, 269 A.2d 182 (1970) (citations omitted).

In *Reagan and Edwards v. State,* 6 Md.App. 477, 251 A.2d 615 (1969), a man returned to his apartment early one afternoon, unlocked the front door and entered to find three strangers inside, one of whom stated that he was working in the apartment. Although there was evidence that one balcony window as well as the front door was closed, there was no testimony that the apartment had been "secured" or that other doors and windows were closed when the victim left his apartment earlier. In the absence of evidence of physical tampering with any part of the building, we held that the evidence was insufficient to show a breaking.

In the case *sub judice* there is no direct evidence as to how or under what circumstances Finke entered the Shilling house, other than his statement to Detective Mock that he guessed his aunt let him in. The finding of a trespassory entry, or breaking, essential to the verdict could only have been reached by deduction or inference from evidence of other facts.

Since the conviction is based upon circumstantial evidence, we are confronted at the outset with two questions: (1) What level of proof is required to support a conviction based

on circumstantial evidence? (2) If a necessary element of the offense can be established only by circumstantial evidence, what level of proof is required to establish it? The answers to both questions involve an interplay between two elusive concepts. One, the speculative nature of circumstantial evidence. Two, the requirement that evidence, to be legally sufficient to sustain a conviction, must establish guilt beyond a reasonable doubt. *Jackson v. Virginia, supra.*

■ It is, of course, beyond dispute that circumstantial evidence may be sufficient to sustain a conviction. *Veney v. State,* 251 Md. 182, 246 A.2d 568 (1968).

Circumstantial evidence "embraces all offered evidentiary facts not being assertions from which the truth of the matter asserted is desired to be inferred." 1 Wigmore, *Evidence* § 25 (3d Ed.1940). Stated in other terms, "[c]ircumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experiences." *Hall v. State,* 32 Md.App. 49, 53–54, 358 A.2d 632 (1976). "[T]here may be drawn an inference of one fact from proof of another or others if there is some rational connection between the fact or facts proved and the ultimate act inferred so that the inference drawn from the proof is not so farfetched as to be arbitrary." *Anglin v. State,* 244 Md. 652, 657, 224 A.2d 668 (1966). *See also, Lindsay v. State,* 8 Md.App. 100, 108, 258 A.2d 760 (1969).

The burden of persuasion that rests with the State in a criminal proceeding is expressed in terms of proof beyond a reasonable doubt. Numerous attempts have been made to quantify "this elusive and undefinable state of mind." 9 Wigmore, *Evidence,* § 2497 (Chadbourn rev. 1981). These ventures have occasionally received hostile treatment. "What possible end can such a heaping up of indefinable terms serve, but to confuse and baffle rather than enlighten and aid the average juror?" *Id.* quoting May, C.J., *Some Rules of Evidence: Reasonable Doubt in Civil and Criminal Cases,* 10 Am.L.Rev. 642 (1876).

Predictably, the union of circumstantial evidence and proof beyond a reasonable doubt has resulted in inconsistent, and often conflicting, pronouncements of law. One commentator declares that "[t]o justify a conviction of crime on circumstantial evidence alone, the inferences to be derived from the established circumstances must be inconsistent with any reasonable theory of innocence." 4 *Jones on Evidence,* § 29:6 (6th Ed. 1972). Conversely, the United States District Court for the District of Maryland has held that the State is not required to "exclude every reasonable hypothesis consistent with innocence of the accused, even when the evidence is entirely circumstantial." *Coates v. State of Maryland,* 436 F.Supp. 226, 230 (D.Md.1977) (citation omitted). An analysis of the principal cases in the Court of Appeals and in this court in which this subject has been addressed indicates that the law in Maryland has undergone a gradual change from the proposition expressed by Professor Jones to the position stated by the District Court.

In *Shelton v. State,* 198 Md. 405, 84 A.2d 76 (1951), the Court of Appeals held that the evidence presented at trial was legally sufficient to sustain the conviction of the owner-operator of a bar for promoting and being concerned in carrying on a lottery. At trial the State showed through the following evidence that a numbers game was being operated in the bar. The bartender had accepted a numbers slip and a dollar bill from a police informer. Several pads of the same size as the number slips were found on the cash register. Furthermore, the previous day's winning number was prominently displayed on the mirror behind the bar.

The appellant bar owner argued that the evidence in the case was not legally sufficient to satisfy its submission to the jury. The Court of Appeals defined the law as follows:

> In a criminal case the fact must be shown or the inference supported beyond a reasonable doubt or to a moral certainty, or a reasonable doubt of an opposite fact must be created. Before a verdict of guilty is justified, the circumstances, taken together, must be inconsistent with, or

such as to exclude, every reasonable hypothesis or theory of innocence.

*Id.* at 412, 84 A.2d 76 (citations omitted).

The Court rejected the appellant's arguments, holding that "there can be no reasonable doubt that the numbers game was being operated openly and notoriously in appellant's bar." *Id.* at 413, 84 A.2d 76.

*Brown v. State,* 222 Md. 290, 159 A.2d 844 (1960), involved the slaying of a police officer by a suspect in the officer's custody. The appellant was walking with the officer through an alley leading to the rear of the Salisbury City Hall. Two girls, who were walking nearby, testified at trial that the appellant shouted, "Hey, you," and then produced a gun from inside his coat. The girls said the officer turned around and reached for the gun. The girls then hid behind a building and, after hearing a single shot fired, went back into the alley to see the appellant running from the alley with the gun in his right hand. The officer died a short time later.

The gun was still in Brown's possession when he was arrested. A ballistics expert identified a bullet and shell found in the alley as coming from Brown's gun. Furthermore, the expert testified that the gun could not have been accidentally discharged without a pull on the trigger.

The appellant contended that the trial court was in error by refusing to grant his prayer. The proposed prayer, in part, would have instructed the jury that "in order to justify the inference of guilt from such [circumstantial] evidence, the existence of the inculpatory facts must be absolutely incompatible with the innocence of the accused and insusceptible of explanation upon any other hypothesis than that of his guilt." *Id.* at 295, 159 A.2d 844.

The Court held that such an instruction was not an accurate description of the law.

[W]hen guilt is based *solely* upon circumstantial evidence, the circumstances, taken together, must be inconsistent with, or such as to exclude every *reasonable* hypothesis or

theory of innocence. *Vincent v. State,* 220 Md. 232, 237, 151 A.2d 898. The Maryland rule is, we think, correctly stated in *Vincent,* but it is a far cry from the postulates contained in the requested prayer. The prayer would permit an inference of guilt upon circumstantial evidence only when the existence of the inculpatory facts is absolutely incompatible with the innocence of the accused and insusceptible of explanation upon *any* other hypothesis than that of his guilt. This would just about require proof of guilt in criminal cases to the degree of mathematical precision; a degree of proof that has never been deemed essential in Maryland, nor, insofar as it has come to our attention, elsewhere.

*Id.* at 296, 159 A.2d 844 (emphasis in original).

Thus, the Court rejected appellant's arguments and held that the trial court committed no error in refusing the instruction.

In *Nichols v. State,* 5 Md.App. 340, 247 A.2d 722 (1968), this court carefully analyzed the test of legal sufficiency of circumstantial evidence. Nichols had been convicted of assault upon Seymour Goldstein and his wife and their children. Mr. Goldstein represented the appellant's wife, who was also Mr. Goldstein's secretary, in a divorce proceeding. Evidence showed that appellant had told Mr. Goldstein that if he did not fire Mrs. Nichols and cease to represent her, then appellant would "pick [him] off with a rifle." *Id.* at 344, 247 A.2d 722.

On October 30, 1966, at approximately 3:00 a.m., Mr. Goldstein received a phone call from a person who identified himself as "Vonnie's husband, Robert Nichols . . ." *Id.* The caller told Mr. Goldstein, "I am getting tired of fooling around with this thing in court. I am going to pick you off with a high-powered rifle." *Id.* At approximately 4:00 a.m. the Goldstein house was fired upon with three bullets entering the residence. The State relied upon the above evidence, together with other circumstantial evidence. Appellant ar-

gued that the evidence was not legally sufficient to sustain his assault convictions.

After reviewing the decisions of the Court of Appeals in *Shelton, Vincent,* and *Brown,* we stated that "[n]o greater degree of certainty is required when the evidence is circumstantial than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused." *Id.* at 350, 247 A.2d 722. We noted that "[p]roof of guilt beyond all doubt had never been required." *Id.* at 351, 247 A.2d 722 (citation omitted).

> "[C]ircumstantial evidence need not be such that no possible theory other than guilt can stand. * * * It is not necessary that the circumstantial evidence exclude every possibility of the defendant's innocence, or produce an absolute certainty in the minds of the jurors. The rule does not require the jury to be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish the defendant's guilt." 3 *Wharton's Criminal Evidence* (12th Ed.1955) § 980, p. 477. While it must afford the basis for an inference of guilt beyond a reasonable doubt, it is not necessary that each circumstance, standing alone, be sufficient to establish guilt, but the circumstances are to be considered collectively. 1 *Underhill's Criminal Evidence* (5th Ed.1956) § 17, p. 23 and p. 25.

*Id.* at 351, 247 A.2d 722.

The court concluded that the evidence was sufficient to sustain the assault convictions.

Two years later in *Metz v. State,* 9 Md.App. 15, 262 A.2d 331 (1970), we found it necessary to explain our decision in *Nichols.* Metz had been convicted of assaulting his wife with the intent to maim, disfigure or disable her. He argued that the evidence was insufficient to sustain his conviction in that it was solely circumstantial in nature. Again called upon to consider the sufficiency of circumstantial evidence, we acknowledged that we had explained the test and its history in *Nichols.* But, after reviewing our

decision in *Nichols,* we were "constrained to conclude that the language impressed upon the general test for the sufficiency of the evidence when the evidence is solely circumstantial does not, in fact, refine the general test." *Id.* at 22, 262 A.2d 331. Concluding that the only distinction between the "solely circumstantial" test of *Nichols* and the general "beyond a reasonable doubt" test was a semantic one and not a substantive one, we stated what we saw as the proper test as to the sufficiency of evidence:

> To be sufficient in law to justify a conviction, the admissible evidence adduced must show directly, or circumstantially, or support a rational inference of, the facts to be proved from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged.

*Id.* at 23, 262 A.2d 331.

As noted in footnotes in both *Nichols* and *Metz,* the United States Court of Appeals for the Fourth Circuit, citing the Supreme Court in *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), has held that circumstantial evidence "is, of course, sufficient to support the verdict, although it does not exclude every reasonable hypothesis consistent with innocence." *United States v. Ragland,* 306 F.2d 732, 734 (4th Cir.1962).

In *Dorsey v. State,* 9 Md.App. 80, 262 A.2d 591 (1970), the accused requested an instruction to the effect that "[b]efore a verdict of guilty is justified, the circumstances taken together, must be inconsistent with, or such as to exclude every reasonable hypothesis or theory of innocence." *Id.* at 89, 262 A.2d 591. We acknowledged that such language "has been approved in the past, but as applicable, in any event, only when the evidence was *solely* circumstantial." *Id.* (footnote omitted). Since there was direct evidence of both *corpus delicti* and criminal agency, we found no error in the refusal to grant the requested instruction, citing *Metz* for the test of sufficiency of the evidence.

In *Graham v. State,* 13 Md.App. 171, 282 A.2d 162 (1971), the appellant argued "that since the evidence presented by the State was solely circumstantial, guilt can only be established if every other reasonable hypothesis of innocence is excluded." *Id.* at 178, 282 A.2d 162. We rejected that proposition. "[T]his argument, which at times has assumed the dimensions of a litany, does not accurately reflect the law. See *Metz v. State,* 9 Md.App. 15 [262 A.2d 331]. Proof of guilt beyond all doubt has never been required, even in the most serious criminal cases. *Pettis v. State,* 2 Md.App. 651, 653 [236 A.2d 429]." *Id.* at 178–79, 282 A.2d 162. Affirming the convictions, we held that "[u]nder the totality of circumstances . . . there was ample evidence from which the jury could find the appellant guilty of murder in the first degree and guilty of armed robbery." *Id.* at 180, 282 A.2d 162.

Judge Orth, who had authored the *Nichols, Metz* and *Dorsey* opinions, speaking for the court in *Young v. State,* 14 Md.App. 538, 288 A.2d 198 (1972), again had an opportunity to clarify the decisions in *Nichols* and *Metz.*

> We discussed the so-called circumstantial evidence rule at length in *Nichols v. State,* 5 Md.App. 340 [247 A.2d 722], indicating that perhaps it did not mean precisely what it appeared to say. In *Metz v. State,* 9 Md.App. 15, 23 [262 A.2d 331] we said flatly that " * * * the test for sufficiency is the same whether the evidence be direct, circumstantial, or provided by rational inferences therefrom."

*Id.* at 558, 288 A.2d 198. *Young* also restated our position in *Graham,* declaring "that the statement that for evidence solely circumstantial to be sufficient to convict, the circumstances, taken together, must be inconsistent with, or such as to exclude every reasonable hypothesis or theory of innocence, does not accurately reflect the law. . . ." *Id.* at 558, 288 A.2d 198. *See also, Dove v. State,* 47 Md.App. 452, 423 A.2d 597 (1980).

The principle expressed in *Metz* and *Nichols* had been adopted earlier by the United States Supreme Court in *Holland v. United States, supra.* In *Holland,* the Govern-

ment relied solely upon circumstantial evidence to show that the defendants had willfully attempted to evade their income taxes. The petitioners argued before the Court that the trial judge's jury instructions were erroneous in failing "to instruct that where the Government's evidence is circumstantial it must be such as to exclude every reasonable hypothesis other than that of guilt." *Id.* 348 U.S. at 139, 75 S.Ct. at 137. The Court recognized that some support for that position could be found in some lower court decisions. However, the Court rejected petitioners' argument holding that "the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect. . . ." *Id.* at 139–140, 75 S.Ct. at 137 (citations omitted).

The Supreme Court re-embraced *Holland* in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). There the question concerned the proper level of review by a federal habeas corpus court when it reviews the sufficiency of the evidence of a state court conviction. This inquiry was made in light of *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The Court held that "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilty beyond a reasonable doubt." *Id.* 443 U.S. at 318, 99 S.Ct. at 2788 (footnote omitted).

The holding, however, was of little consolation to Jackson. He argued that the above standard, when applied to the record, could not support his conviction, contending that the uncontradicted evidence supported a series of inferences which supported his claim of self-defense and thus innocence. The Court rejected the argument. "Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's challenge be sustained. That theory the Court has rejected in the past.

*Holland v. United States,* 348 U.S. 121, 140 [75 S.Ct. 127, 137, 99 L.Ed. 150]. We decline to adopt it today." *Id.* 443 U.S. at 326, 99 S.Ct. at 2792.

In *U.S. v. Becker,* 62 F.2d 1007, 1010 (2d Cir.1933), Judge Learned Hand, addressing the subject in the context of jury instruction, said:

> The judge failed to charge the jury as to circumstantial evidence, contenting himself with an entirely neutral statement of the opposed contentions of the parties, though he had been asked to say that such evidence was enough only when it foreclosed the hypothesis of innocence. He had with ample elaboration told them that they must be satisfied beyond fair doubt of the defendant's guilt, and that in our judgment was enough, though some courts have held otherwise. The requirement seems to us a refinement which only serves to confuse laymen into supposing that they should use circumstantial evidence otherwise than testimonial. All conclusions have implicit major premises drawn from common knowledge; the truth of testimony depends as much upon these, as do inferences from events. A jury tests a witness's credibility by using their experience in the past as to similar utterances of persons in a like position. That is precisely the same mental process as when they infer from an object what has been its past history, or from an event what must have preceded it. All that can be asked is that the importance of the result to the accused shall demand a corresponding certainty of his guilt; and this is commonly and adequately covered by telling them that the conclusion shall be free from fair doubt. To elaborate this into an inexorable ritual, or to articulate it for different situations, is more likely to impede, than to promote, their inquiry. (citations omitted)

The principle explicated in *Nichols* and *Metz* received the approval of the Court of Appeals in *Pressley v. State,* 295 Md. 143, 454 A.2d 347 (1983). Pressley had excepted to the trial court's instructions as to circumstantial evidence, particularly to that part of the instruction which stated that the

law did not require the jury "to be satisfied beyond a reasonable doubt as to each link in a chain of circumstances necessary to establish defendant's guilt." He argued that since a chain is only as strong as its weakest link each link had to meet the test of proof beyond a reasonable doubt. The Court repeated the language from *Wharton's Criminal Evidence* and *Underhill's Criminal Evidence* which we had quoted in both *Nichols* and *Metz.*

The Court in *Pressley* rejected the argument that a chain of circumstantial evidence can only be as strong as its weakest link, quoting from *Lampitt v. State,* 34 Wyo. 247, 242 P. 812 (1926), which stated:

> "Circumstantial evidence is not like a chain which falls when its weakest link is broken, but is like a cable. The strength of the cable, as stated in *Ex parte Hayes,* 6 Okla.Crim. [321,] 33 [–34], 118 Pac. [609,] 614 [ (1911) ]: 'does not depend upon one strand, but is made up of a union and combination of the strength of all its strands. No one wire in the cable that supports the suspension bridge across Niagara Falls could stand much weight, but when those different strands are all combined together, they support a structure which is capable of sustaining the weight of the heaviest engines and trains. We therefore think it erroneous to speak of circumstantial evidence as depending on links, for the truth is that in cases of circumstantial evidence each fact relied upon is simply considered as one of the strands and all of the facts relied upon should be treated as a cable.' "

*Id.* 295 Md. at 150, 454 A.2d 347 (citation omitted).

Not directly expressed by the Court of Appeals in *Pressley* or by us in *Nichols, Metz, Dorsey,* or *Young* but clearly implied in *Pressley* and *Metz* is the rejection of the old adage that it is impermissible to "pile inference upon inference." Although frequently repeated, this trite expression, which is founded upon an underlying distrust of inferences that rest upon too many intervening inferences, has been soundly

criticized. 1 *Wigmore on Evidence, supra,* § 41, flatly states that "circumstantial evidence may be proved by the same kind," quoting Maxey, J., in *Neely v. Provident Life & Acc. Ins. Co.,* 322 Pa. 417, 185 A. 784 (1936):

> When jurors in their deliberations arrive by a process of reasoning at an acceptable inference of fact, they have a right to add such fact to any previous facts found by them and proceed by ratiocination from such fact or facts to additional inferences of fact and then proceed still further by like process until they arrive at the ultimate conclusion on the issue trying.

Thus, if the jury finds from direct evidence the existence of facts A, B and C and can reasonably infer the existence of fact D therefrom, there is no logical reason why it may not then add fact D to its pool of findings and from the combination of facts A, B, C and D infer fact E. Indeed, everyone does precisely that in everyday life, frequently reaching conclusion E without consciously recognizing that inference D was necessarily drawn in the process.

Our review of the evidence in the case *sub judice,* in the light of the principles applicable to circumstantial evidence, persuades us that the jury could rationally find beyond a reasonable doubt all of the elements of felony murder, including the essential elements of the underlying felony.

■ There was evidence to the effect that because Mrs. Shilling suffered from emphysema, the air conditioner was on and the doors and windows were kept closed. The front door was always locked; family, guests and visitors all entered through the kitchen door. The nature of Mr. Shilling's work was such that he constantly tracked dirt into the house and for that reason Mrs. Shilling always wore slippers and never went barefoot in the house. In a telephone conversation with her daughter minutes before she was killed, Mrs. Shilling indicated that she and her grandson were alone in the house, that she had put the child down for a nap and was about to take a nap herself. When Mr. Shilling returned home, the child was asleep on the sofa and

Mrs. Shilling's body was on the floor. She was barefoot; her slippers were beside the couch. There were blankets on the couch.

Although Finke was Mrs. Shilling's nephew and he had been a frequent guest in the past, he had not been to the Shilling house for about a year and a half. There was no explanation for his presence; there was no indication that he was expected, but Mr. Shilling indicated he would have been welcome to visit.

From those facts it is reasonable to infer that the doors and windows were closed when Finke arrived at the house. A reasonable inference could be drawn that the child was asleep and that Mrs. Shilling did not get up from the sofa and walk barefoot to the kitchen door to open it. True, the evidence does not exclude the theory that Mrs. Shilling either walked barefoot to the door and opened it or, while lying on the sofa, called an invitation to Finke to enter; but, as we have seen, circumstantial evidence need no longer exclude such hypotheses. Since it was not as likely that Mrs. Shilling would break a long-established habit to walk around barefoot and it was also not as likely that she would have remained on the living room sofa where the child was sleeping and called out an invitation to a guest at the kitchen door to enter, the most logical, probable and, therefore, rational inference to be drawn from the evidence was that Finke opened the door and entered the Shilling house without invitation. Because he had not visited his aunt for about a year and a half and was not expected on this occasion, in the absence of any legitimate basis for his presence, the jury could have rationally inferred that Finke's entry was trespassory in nature, i.e., a breaking.

The intent element of the underlying felony of housebreaking, however, presents a somewhat different problem.

■ The State argues on this appeal, as it had on the last appeal and at both trials, that the evidence could support a finding that Finke broke into the Shilling house with an intent to steal. It points to the testimony that Finke needed

money to pay for previously purchased drugs and to put his van in working condition as suggestive of a motive for theft. But there was no indication that appellant's financial status on June 8, 1979, was unusual for him. In fact, he was due to receive his paycheck that afternoon. A general state of financial difficulties will not support an inference of motive or intent to steal. Indeed, the fact that nothing was taken from the Shilling home although cash and jewelry were in plain sight tends to belie an intent to steal. *See, e.g., Felkner v. State,* 218 Md. 300, 307, 146 A.2d 424 (1958). (The Court recognized that "[t]he most conclusive evidence that the breaking was with the intent to steal is the larceny itself. . . ." Thus, while intent may be proven although nothing is taken, that fact tends to negate intent when there are no other facts or circumstances which tend to show intent.)

■ Referring to evidence that the Shillings had planned to be in Las Vegas by June 8 but postponed the trip at the eleventh hour, the State theorized that Finke went to the Shilling home expecting it to be unoccupied and thus susceptible to theft; that he was surprised by Mrs. Shilling and killed her; and that he was forced to flee through the front door without stealing anything because Mr. Shilling arrived at the back door just after the murder. In the absence of any evidence tending to indicate that Finke had any knowledge of the Shillings' vacation plans or any evidence pinpointing the time of the murder any closer than some time between 1:50 and 2:28 p.m., the State's hypothesis rests upon pure speculation, not rational inference. We were unpersuaded on the prior appeal that the evidence supported a finding of intent to steal; we are equally unpersuaded on this appeal.

■ We believe, however, that the jury could have found, beyond a reasonable doubt, the requisite intent element of the underlying felony of daytime housebreaking, that is, an intent to murder. When one breaks into someone else's house and commits a crime therein, in the absence of other evidence of intent, the best evidence of what he

intended to do is what he did. *See, Felkner v. State, supra.* That permissible inference, as we noted on the prior appeal, is sufficient under the test of *Jackson v. Virginia, supra,* and *State v. Rusk, supra.*[8]

Appellant argues that in applying the felony-murder doctrine to a particular set of circumstances, one must keep in mind its deterrent purpose, *Campbell v. State,* 293 Md. 438, 450, 444 A.2d 1034 (1982); that the purpose of the felony-murder rule is to deter felons from killing negligently or accidentally by holding them strictly responsible for any killings they commit, *People v. Washington,* 62 Cal.2d 777, 44 Cal.Rptr. 442, 445, 402 P.2d 130, 133 (1965); that since a person entering a building with intent to assault his victim with a deadly weapon is not deterred by the felony-murder rule, that doctrine should only be applied to some felony independent of the homicide, *People v. Wilson,* 1 Cal.3d 431, 82 Cal.Rptr. 494, 462 P.2d 22 (1969); and, therefore, one cannot be convicted of felony murder if the underlying felony was housebreaking with intent to murder. That argument is interesting and might even be persuasive were it not for the fact that Md.Code Ann., art. 27, § 410, expressly provides that felony murder includes murder committed in the perpetration of daytime housebreaking as defined in art. 27, § 30(b) and, as we have seen, § 30(b) includes breaking a dwelling house "with intent to commit murder or felony therein."

## II. and III.  MOTION TO SUPPRESS

We will treat appellant's second and third contentions together since they both relate to the court's ruling on his motion to suppress oral statements.

Appellant contends that the statement which the police elicited from him was not given voluntarily and thus was

---

8. A conviction of felony murder based upon an underlying felony of housebreaking with intent to murder would be inconsistent with the verdict of not guilty of premeditated murder. Such inconsistency does not invalidate the conviction. *See Ford v. State,* 274 Md. 546, 337 A.2d 81 (1975); *Johnson v. State,* 238 Md. 528, 209 A.2d 765 (1965); *Leet v. State,* 203 Md. 285, 100 A.2d 789 (1953).

improperly received into evidence by the trial court. In dealing with appellant's argument, we must "determine initially whether the activity complained of comports with the requirements of this State's nonconstitutional law, and then, only if the court finds that it so complies, does it become necessary to reach the issue of whether any constitutional stricture prohibits the conduct in question." *Hillard v. State,* 286 Md. 145, 150 n. 1, 406 A.2d 415 (1979).

■ Appellant points to three separate inducements made by the police; each of which, he alleges, constitutes a violation of state nonconstitutional confession law. First, appellant cites Detective Mock's representation that he would try to help people who tell him the truth. Appellant claims that this statement induced him to give a confession [9] to Mock. The State, on the other hand, argues that appellant is taking Mock's statement out of context. Mock testified that he made the statement during a time when appellant was suffering from memory lapses. The detective explained that the statement was a promise to check out any leads or witnesses appellant might bring to his attention.

In *Hillard v. State, supra,* the Court of Appeals held that the petitioner's inculpatory statement was given as a result of improper police inducement. Hillard gave a confession after being told by a detective "that he would 'go to bat' for petitioner before the court, and that ultimately petitioner would be 'cut loose' if the statement he made was corroborated by any of the others involved in the robbery and slaying." *Id.* at 148, 406 A.2d 415. The Court reviewed its prior decisions in the area and then rendered the following declaration:

---

**9.** While there is some question under the facts of this case whether appellant's statement was, strictly speaking, a confession or only an admission, it is "significantly incriminating" and thus could be admitted into evidence at trial only if it met the test of voluntariness. *Stewart v. State,* 232 Md. 318, 323, 193 A.2d 40 (1963); *see also, Hillard v. State, supra,* at 150 n. 2, 406 A.2d 415; *Clark v. State,* 48 Md.App. 637, 641 n. 2, 429 A.2d 287 (1981).

From this line of cases, it clearly emerges that under Maryland criminal law, independent of any federal constitutional requirement, if an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his declaration will be considered to have been involuntarily made and therefore inadmissible.

*Id.* at 153, 406 A.2d 415.

Appellant argues that *Hillard* renders his statement inadmissible; that Detective Mock's representation in effect told appellant that making an inculpatory statement would be to his advantage. This court has observed that the intent of *Hillard* was to "deter the police from making *any* statements to a defendant which would plant the seed of the possibility of an advantage as a result of the rendition of a confession." *Bellamy v. State,* 50 Md.App. 65, 76, 435 A.2d 821 (1981) (emphasis in original). It is appellant's conclusion that *Hillard* and *Bellamy* necessitate a ruling in his favor. We disagree.

In *Clark v. State,* 48 Md.App. 637, 429 A.2d 287 (1981), this court was faced with a similar factual situation. There, the police told Clark that if he knew any other facts concerning the case they would investigate them for him. Clark argued that such a statement amounted to a promise of a benefit to him and thus improperly induced him to give inculpatory statements. We rejected his contention.

We do not think there was any inducement in Detective Waters' statement that whatever statement appellant made could be investigated. Appellant could not have believed that any investigation of an inculpatory statement so as to determine the likelihood of its truth could possibly be beneficial to him. On the contrary, an investigation of an inculpatory statement could lead to other inculpatory evidence supporting its truthfulness.

*Id.* at 643–44, 429 A.2d 287.

█ In the instant case, appellant was told that if he remembered any additional details about the day in question

then Mock would "help" him. Mock pointed out that in the context in which it was made, the statement clearly meant that he would "check out" appellant's story. Here, as in *Clark,* there was no improper inducement. When a detective tells a defendant that he will help the defendant by investigating the details of the defendant's statement, how does this induce the defendant to make an *inculpatory* statement? If anything, this is a police promise of help in exchange for a defendant's *exculpatory* statement.

When a defendant is told that if he "tells the truth" then the police will "go to bat for him" or help him with the State's Attorney, he is being coerced into giving a confession. He is faced with a disturbing dilemma: give a confession and receive a lesser punishment (by virtue of the police going to bat for him) or maintain his innocence by exercising his right to remain silent and, if found guilty, receive a greater punishment (by virtue of his being "uncooperative"). Such a situation is not present here; there is no promise of benefit in exchange for a confession.

■ Appellant next points to Detective Moore's statement that the victim's three-year-old grandson could identify appellant as the killer and that the police could bring the child in to make the identification; but, if this was necessary, the child would likely be emotionally damaged for the rest of his life. Appellant claims that this statement amounted to a threat to harm an innocent three-year-old and that, in order to prevent this, appellant was induced to render his statement.

To support his contention, appellant relies upon *Stokes v. State,* 289 Md. 155, 423 A.2d 552 (1981). There, the police arrived at petitioner's house in order to conduct a search, pursuant to warrant, for illegal narcotics. After a period of about five minutes, the police, having had no success in their search for the contraband, informed the petitioner " 'that if he would produce the narcotics, his wife would not be arrested.' " *Id.* at 157, 423 A.2d 552. The petitioner then revealed the location of the drugs to the police. Petitioner

argued that his statement to the police indicating the contraband's location "was involuntary since it was induced by a police promise not to arrest his wife." *Id.*

The Court reviewed its decision in *Hillard* and extended that rule to "a promise not to harm (physically or emotionally) a near relative with whom the defendant naturally has a close bond of affection." *Id.* at 160, 423 A.2d 552 (footnote omitted). Here, appellant contends that Moore's statement concerning the three-year-old was a threat to emotionally harm his near relative (the child is appellant's cousin) and that his statement was induced by that threat.

We have two problems with appellant's argument. First, it does not appear that appellant has a "close bond of affection" with the child. In *Stokes,* the threat was made upon the petitioner's wife. While the court refused "to consider whether kinship is required, or the degree of closeness (kinship or otherwise) that a defendant must have to the affected third party, before the coercive effect of such inducements may be found to exist," *id.* at 160 n. 2, 423 A.2d 552, it is evident that something more than a casual relationship or distant kinship is required. For example, in *Bellamy v. State, supra,* this court held that a promise by the police to go to the State's Attorney on behalf of the appellant's *fiancee* was an improper inducement. While we, like the Court in *Stokes,* decline to determine what degree of closeness is required to be present before the coercive effect of such inducements may be found to exist, we are of the opinion that such degree of closeness is absent here. The record contains nothing to indicate that appellant actually enjoys a particularly close relationship with the child, and the nature of their kinship does not imply such a closeness.

Second, the statements of Detective Moore did not constitute a threat of "harm" as that word was used in *Stokes* and *Bellamy.* In *Stokes* the police promised not to arrest the defendant's wife. Thus, the harm that was being avoided was a harm which was within the power of the police to inflict. Likewise, in *Bellamy* the police promised to talk to

the State's Attorney about arranging the release of the defendant's fiancee. Again, the officer was promising to take direct action on behalf of the defendant.

Here, a threat or promise (a promise being nothing more than an implied threat) of direct police action is absent. There was neither a threat to arrest a third person nor a promise not to arrest that person. Rather, Detective Moore was relating to appellant the possible adverse consequences to a young child if that child were forced to identify his grandmother's killer. There was no threat of direct police action against the child if appellant failed to give an inculpatory statement. Rather, an appeal to a suspect to give a confession in order to prevent an innocent child from being hurt is a "classic interrogation technique." *Rhode Island v. Innis,* 446 U.S. 291, 306, 100 S.Ct. 1682, 1692, 64 L.Ed.2d 297 (1980) (Marshall, J., dissenting) (citation omitted). Such a ploy is similar to asking a sex offense suspect to confess in order to spare emotional harm to the victim if she is forced to testify. *See* F. Inbau & J. Reid, *Criminal Interrogation and Confessions,* 60–62 (2d ed. 1967).

■■■ Finally, appellant argues that Detective Moore's statement, "I'm going to let you go on home or let you go, and I'm going to go to your uncle and tell him you killed your aunt and just can't remember," was an improper inducement. He contends that this statement amounted to a threat "to let the aggrieved widower take the law into his own hands." Furthermore, appellant alleges that this is particularly true given Mr. Shilling's admitted tendency to lose control of his temper.

The State counters that, even if such a statement could be interpreted as an implied threat of physical harm, it did not induce appellant to make the incriminating statement. In fact, appellant, at the suppression hearing, testified that his reaction to Detective Moore's statement was to say, "you don't have to do that . . . I'll go down and tell him what's . . . what's been going on." Appellant argues that his initial reaction to the threat is irrelevant because " '[p]hysical

violence or threat of it automatically invalidates confessions and in such cases "there is no need to weigh or measure its effects on the will of the individual victim" ' . . . ." *Jackson v. State,* 209 Md. 390, 395, 121 A.2d 242 (1956) (citations omitted).

We reject appellant's contention that Detective Moore's statement was a threat of physical violence. In so holding, we rely upon appellant's own reaction to the statement. We do so not to weigh the effects of a threat on a suspect but rather to determine if the statement was a threat in the first place. Moore's statement was obviously not an overt threat of immediate physical violence. Rather, at most, it was a disguised warning of future physical harm to appellant. By examining appellant's reaction, we conclude that Moore's statement was not such a threat. Such an ambiguous statement could be a threat only if appellant perceived it to be one. Here, he did not.

Having determined that appellant's statement comports with State nonconstitutional law, we now find it necessary to delve into constitutional due process considerations. In determining whether a statement was made voluntarily, and therefore meets the requirements of the due process clause, the standard to be applied is "whether the 'totality of the circumstances' deprived the defendant of his power to resist." Whitebread, *Criminal Procedure* § 15.02 (1980) (footnote omitted) [citing *Fikes v. Alabama,* 352 U.S. 191, 197, 77 S.Ct. 281, 284, 1 L.Ed.2d 246 (1957)]. In making this inquiry, the Supreme Court has mandated that we conduct an independent review of the record. *Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966); *see also, Leuschner v. State,* 45 Md.App. 323, 350, 413 A.2d 227 (1980); *Hopkins v. State,* 19 Md.App. 414, 423–24, 311 A.2d 483 (1973).

Although there is no restriction upon the factors to be considered in the voluntariness determination, this court had occasion in *Leuschner v. State, supra,* 45 Md.App. at 351, 413 A.2d 227 to list eleven items which should not be

overlooked. First, we should consider the accused's age. Appellant was twenty-six years old at the time of the crime. Two, his character—nothing out of the ordinary; he does not appear to be introverted, shy or particularly impressionable. Third, we must examine his record as to former crimes. Appellant had previously confessed to and been convicted of storehouse breaking. This is an important factor in this case because it indicates that appellant was no stranger to police interrogation. Appellant's educational background, the fourth factor, shows that he is a high school graduate. Fifth, he is of at least average intelligence. The first five factors taken together paint a picture of appellant as someone who is "not young, soft, ignorant or timid. [He is] not inexperienced in the ways of crime or its detection, nor [is he] dumb as to [his] rights." *Stein v. New York,* 346 U.S. 156, 185–86, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522 (1953).

Factor six, the legality or illegality of his arrest, is not applicable here because appellant was not under arrest at the time he made his statement. It was clear to everyone involved, including appellant, that he was free to leave at any time. Likewise, factors seven through nine are also inapplicable: conditions of incarceration, delay in presentment to a commissioner, and removal to a distant jail.

Appellant argues that factor ten, prolongation of the interrogation, works in his favor. He points out that he was questioned throughout the night and early morning hours and that the police questioned him in "relays," thus allowing only the officers to have any periods of rest. It is important to note, however, that appellant was free to leave at any time he chose. In fact, he wished to continue the questioning after the detectives had decided to go home for the night. Indeed, appellant chose to spend the night at the station, sleeping on a sofa, so that he could resume the questioning as early as possible in the morning. Throughout this time, appellant was never incarcerated but rather was free to leave at any time. He was never deprived of food or drink. Furthermore, the fact that there was more than one interrogator is not sufficient to indicate a use of "relays" to

wear down appellant's will. "The Supreme Court has 'never gone so far as to hold that the Fourteenth Amendment requires a one-to-one ratio between interrogators and prisoners, or that extensive questioning of a prisoner automatically makes the evidence he gives in response constitutionally prohibited.' *Stein, supra* at 185 [73 S.Ct. at 1077]." *Leuschner v. State, supra* 45 Md.App. at 352, 413 A.2d 227. Finally, the eleventh factor looks at the failure to warn the accused of his rights. Here, appellant was twice given *Miranda* warnings at the police station. Thus, a quick overview of the eleven factors listed in *Leuschner* indicates that appellant's statement was voluntary and comports with due process.

■ Appellant, however, points to other items of police conduct which he alleges make his statement involuntary in nature. First, he argues that the police use of a polygraph test "compelled" him to speak. When the police incorrectly told him that he had failed the test, his argument continues, his will to resist weakened. Appellant relies upon our decision in *Johnson v. State,* 31 Md.App. 303, 355 A.2d 504 (1976), in making his argument. Such reliance is misplaced.

In *Johnson,* a polygraph test was applied to the defendant. He was then told that he had failed the exam, and subsequently he gave an inculpatory statement. This court recognized that a jury may wish to "consider the device or procedure so coercive as to declare the confession to have been involuntary." *Id.* at 308, 355 A.2d 504. While this is true, "[i]t is clear, however, that the use of such a procedure for that purpose would not as a matter of law require the exclusion of a confession so obtained. . . ." *Id.* at 305, 355 A.2d 504 (citations omitted). *See also, Watson v. State,* 35 Md.App. 381, 370 A.2d 1149 (1977); *Mitchell v. State,* 51 Md.App. 347, 353, 443 A.2d 651 (1982). Thus, *Johnson* does not bolster appellant's position.[10]

---

**10.** What Johnson does hold is that when a polygraph exam is given to a defendant who later gives a statement and the trial judge

Second, appellant attacks the lies told appellant by Detective Moore. For example, in addition to being told that he had failed the polygraph and that his three-year-old cousin could identify him as the killer, appellant was told that his fingerprints were recovered from the crime scene, that two eyewitnesses saw him enter the house, that two eyewitnesses saw him leave the house, and that according to an expert he would be unable to remember the incident. Although appellant may feel "betrayed" by the use of deception by the police, this court has previously stated that "deceit [is] a valid weapon of the police arsenal." *Hopkins v. State, supra,* 19 Md.App. at 424, 311 A.2d 483 (1973); *see also, Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684 (1969). In *Hopkins* we held "that the use of trickery by the misrepresentation to the accused of the evidence that the police possessed is, under the circumstances of this case, within the ambit of the 'other proper investigative efforts' recognized by *Escobedo* [*v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977]." *Hopkins v. State, supra,* 19 Md.App. at 424, 311 A.2d 483 (footnote omitted). Appellant seeks to distinguish *Hopkins* by arguing that in *Hopkins* the lied-about evidence was an accomplice's confession whereas here the purported evidence consisted of eyewitnesses, fingerprints, etc. We fail to see the constitutional significance of this distinction. Third, appellant argues that his discussion with Detective Mock concerning the tenets of Roman Catholicism works to make his statement involuntary. When viewed together with the other circumstances surrounding appellant's statement, we cannot say that this discussion caused appellant to make any statement against his will. In fact, if Detective Mock's advice concern-

---

considers that fact in making his preliminary voluntariness determination, then the trial judge must not exclude that fact from the jury when they make their final voluntariness determination. We must note that the trial judge correctly admitted into evidence the fact that a polygraph exam was administered. We must further note that appellant alleges that the trial judge was erroneous in doing so. In making the latter argument, appellant's counsel conveniently ignores the holding in Johnson although he was obviously aware of Johnson.

ing mortal sins would have had the effect of telling appellant to "confess to earthly authorities" as he claims it did, he would have done just that: made a statement *confessing* his criminal act. Instead, he made a statement which was ambiguous on its face but which, through its details, linked appellant with the crime.

■ As a final matter, appellant contends that the trial court erred by considering the accuracy of his statement in denying his motion to suppress it. In raising this argument, appellant points to the portion of the record where the trial judge said that the statement is relevant. This, however, was not improper. First, the trial judge found the statement to have been made voluntarily. Then, after having reached that conclusion, he found that it was relevant to the proceedings. It is important to remember that appellant's statement was not a confession in the true sense of the word. Rather, his statement described the Shilling house on the day of the killing and, thus, tended to link him with the crime scene. The trial judge, after ruling that the statement was made voluntarily, had to determine if the statement was relevant. He did not err in doing so.

## IV.  USE OF BLEVINS' STATEMENTS TO THE POLICE

■ Appellant contends that the trial court erred by receiving into evidence statements given to the police by Donald Blevins some five weeks after the date of the murder. On July 11, 1979, Blevins told the police that on the day of the murder, he and Finke were on the Acme parking lot sometime between 1:30 p.m. and 2:30 p.m. and that he remained in his truck while Finke walked away, returning about 15 minutes later. On July 15, Blevins gave the police some additional details. The State counters that

these statements were properly admitted as prior consistent statements for the purpose of rehabilitating Blevins.[11]

Generally, out-of-court statements made by a witness, which are similar in context to the witness' in-court testimony, are not admissible into evidence. *Harris v. State,* 11 Md.App. 658, 661, 276 A.2d 406 (1971). But, "where the credibility of a witness has been impeached in such a way as to indicate that his present testimony may be a fabrication, prior consistent statements are admissible for rehabilitative purposes if they would tend to show that such consistency was present prior to the time of probable fabrication." *Boone v. State,* 33 Md.App. 1, 6, 363 A.2d 550 (1976); *Coleman v. State,* 49 Md.App. 210, 230, 431 A.2d 696 (1981).

■ Thus, for an out-of-court statement to be admissible as a prior consistent statement, two elements must exist: 1) the witness whose prior statement is being offered must have been impeached so as to indicate that his present testimony is a fabrication and 2) that the prior statement was made before the time of probable fabrication.

On direct examination, Blevins testified that he and Finke were at the Acme parking lot "anywhere from 1:30 to 2:30" on the day Mrs. Shilling was slain. This was crucial testimony for it placed Finke in the area of the Shilling home during the period of time in which the killing took place.

---

11. At trial the State argued, as an alternative position, that the statements were admissible as prior inconsistent statements. The State argued that it had been taken by surprise by Blevins' testimony on cross-examination that his direct testimony was nothing more than speculation, then claimed the right to impeach its own witness through use of prior inconsistent statements. On appeal the State has abandoned this argument and has instead relied upon the rehabilitation rationale in order to support the acceptance of the statements into evidence. We note here that the prior inconsistent statement argument was a meritless one. The use of prior inconsistent statements to impeach one's own witness is permissible solely to explain why the witness was called. *Sun Cab Co. v. Walston,* 15 Md.App. 113, 135, 289 A.2d 804 (1972), *aff'd,* 267 Md. 559, 298 A.2d 391 (1973); *American Stores Co. v. Herman,* 166 Md. 312, 317–318, 171 A. 54 (1934). Here, the reason why Blevins was called was sufficiently explained by his direct examination, which was entirely consistent with his prior statements.

On cross-examination, defense counsel led Blevins to admit that his testimony was "speculation"; that it was very possible that Blevins was mistaken as to the time, and perhaps even the date, that he and Finke were at the lot. After recross and redirect, the State then introduced into evidence the prior statements made by Blevins.

The State asserts that the trial court did not err by receiving the statements into evidence. Its argument is as follows: (1) When the defense elicited Blevins' agreement that his direct testimony was speculation, it had impeached Blevins' credibility as a witness; (2) it then appeared that Blevins' direct testimony may have been a fabrication; (3) therefore, the State could rehabilitate its impeached witness through the use of prior consistent statements so as to indicate that his direct testimony was not a fabrication.

Appellant, on the other hand, contends that Blevins was not impeached in such a way as to indicate that his testimony was a fabrication. The record does not reflect that "a design to misrepresent [was] charged upon the witness...." *Harris v. State, supra,* 11 Md.App. at 661, 276 A.2d 406 quoting *Stocksdale v. Cullison,* 35 Md. 322, 326 (1872). The tone of the cross-examination indicates a desire to attack Blevins' memory rather than his veracity. The line of questioning during the cross-examination focused on the inherent difficulty in remembering what one did at a specific time on a particular day a number of years ago, underscored by Blevins' admission that he could not remember what he had done six weeks prior to his testimony and his statement that, to him, "time is irrelevant."

Nevertheless, this cross-examination did amount to an attempt to show fabrication in that, if Blevins was shown not to accurately remember the facts to which he testified, then, in effect, he was "making it up" or "fabricating it." In *Boone v. State, supra,* we approved the introduction of prior statements to rehabilitate testimony that was impeached by an expert witness' opinion that the memories

of two key witnesses at the time of trial may have been impaired by drug abuse.

Since Blevins' testimony at the second trial in April 1982 had been impeached in such manner as to suggest fabrication, it was appropriate to rehabilitate that testimony by showing that it was consistent with statements made in July 1979, long before there was any suggestion of fabrication. We note that Blevins indicated that his memory at the time he gave the statements to the police may have been as faulty as it was at the time of his testimony at the second trial, but the jury could certainly disregard that proposition. It is utterly inconsistent with human experience that one's memory of details of an event that occurred on June 8, 1979, would have been no better a mere five weeks later than it was in April 1982, almost three years after the event.

The statements made by Blevins to the police in July 1979, therefore, were properly admitted into evidence as prior consistent statements to rehabilitate Blevins' testimony after that testimony had been impeached on cross-examination.

## V. APPELLANT'S TESTIMONY AT THE FIRST TRIAL

At Finke's first trial, his statements to the police were introduced into evidence. As a tactical move, he elected to testify in order to counteract the effects of those statements. We reversed his conviction because the trial court had not rendered a preliminary decision on the voluntariness of the statements. At the second trial, the State read into evidence Finke's testimony from the first trial. Finke argues that because his testimony had been impelled by the improperly admitted statements to the police it was inadmissible as "fruit of the poisonous tree."

Appellant relies upon the Supreme Court's decision in *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), to support his position. At Harrison's trial for murder, the prosecution introduced confessions in

which Harrison admitted the killings. Following the admission of the confessions into evidence, Harrison chose to testify in his own behalf. On appeal, his conviction was reversed on the ground that the confessions had been illegally obtained. On retrial, Harrison chose not to testify; but the prosecution read into evidence, over his objection, his testimony from the first trial. Harrison was again convicted and the United States Court of Appeals for the District of Columbia Circuit affirmed the conviction.

The Supreme Court reversed, holding that Harrison's testimony at the first trial was inadmissible at the second trial because it was "fruit" of the illegally obtained confessions. *Id.* at 223, 88 S.Ct. at 2010. The Court further held that the burden was on "the Government [to] show that its illegal action did not induce his testimony." *Id.* at 225, 88 S.Ct. at 2011 (footnote omitted). The burden of production is placed upon the Government because "the more natural inference is that no testimonial admission so damaging would have been made if the prosecutor had not already spread the petitioner's confessions before the jury." *Id.* at 225–26, 88 S.Ct. at 2011–12 (footnote omitted). Since the Government did not rebut the presumption, the former testimony was inadmissible and the conviction was reversed.

Here, Finke wishes to extend the *Harrison* doctrine. His statements to the police were not illegally obtained. At his first trial, however, his statements were introduced into evidence despite the absence of a preliminary finding of voluntariness by the trial judge. Finke now argues that since there was no such finding, the statements were inadmissible under *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) and that his testimony was impelled by the illegally admitted statements. Therefore, he contends, his testimony from the first trial was inadmissible at the second trial under the *Harrison* doctrine. That argument entails a misreading of *Harrison.*

In *Jackson,* the Court held that the trial court must provide procedures which are "fully adequate to insure a

reliable and clear-cut determination of the voluntariness of the confession, including the resolution of disputed facts upon which the voluntariness issue may depend." *Id.* at 391, 84 S.Ct. at 1788 (footnote omitted). While the Court allowed the states to formulate their own procedures, it expressly prohibited the convicting jury from making the initial determination on voluntariness issue. "It is both practical and desirable that in cases to be tried hereafter a proper determination of voluntariness be made prior to the admission of the confession to the jury which is adjudicating guilt or innocence." *Id.* at 395, 84 S.Ct. at 1790. It is undisputed that such a determination was not made at Finke's first trial. Thus, Finke's first trial did involve a *Jackson* violation.

That there was a *Jackson* violation at the first trial, however, does not render Finke's first trial testimony inadmissible at the second trial. In *Harrison, supra,* the Court stated, "[t]he question is not *whether* the petitioner made a knowing decision to testify, but *why.* If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible." *Harrison, supra* 392 U.S. at 223, 88 S.Ct. at 2010 (emphasis in original) (footnote omitted). In *Harrison,* the illegality which tainted the testimony was the illegal *acquisition* of the confessions.[12] Since the illegality rendered the confessions inadmissible at the second trial, the first trial testimony, which was impelled by the illegal introduction of the confession is likewise inadmissible. The Court focused upon the link between the nature of the illegality and its fruit. "[T]he same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby—the fruit of the poisonous

---

12. Two of the confessions were obtained in violation of *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). The third was obtained in violation of *Harling v. United States,* 295 F.2d 161 (D.C.Cir.1961).

tree, to invoke a time-worn mataphor." *Id.* at 222, 88 S.Ct. at 2010.

██ Here, the illegality which rendered the confession inadmissible was not its illegal acquisition. Rather, it was the failure by the trial court to render a preliminary determination of voluntariness as mandated by *Jackson.* The testimony was tainted by the same illegality, the failure to render a preliminary determination. On retrial, such a determination was made and Finke's statements were found to have been voluntarily made. Thus, his statements were admissible at the second trial. And since the derivative evidence, the testimony, is only inadmissible to the same extent as the statements, the testimony was also admissible at the second trial. In short, the statement was not "the fruit of the poisonous tree" because, as it was eventually determined, the tree was not poisonous.

## VI. THE PSYCHIATRIC EXPERT

At trial, appellant contested the voluntariness of statements he gave to the police. As part of his attack, he sought to introduce the expert testimony of Dr. Brian Crowley. Dr. Crowley, a psychiatrist, was prepared to testify concerning the alleged coercive techniques employed in the police interrogations and their probable effect on overcoming appellant's willpower. Appellant sought to elicit Dr. Crowley's expert opinion through the use of a hypothetical question. The State objected to the question, and the court sustained the objection in part because the testimony related to "an indefinite subjective kind of thing as opposed to being objective" and in part because Dr. Crowley never examined appellant. Appellant contends that the trial court erred in sustaining the objection. To address appellant's contention, we must resolve two questions. One, is psychiatric testimony relevant on the issue of voluntariness? Two, if such testimony is relevant, was the trial court's exclusion of Dr. Crowley's testimony an abuse of discretion?

■ In Maryland "[t]he approved test as to the admissibility of expert opinion is whether the jury can receive appreciable help from the particular witness on the subject, not whether the jury can decide the particular issue without expert help." *Terry v. State,* 34 Md.App. 99, 106–07, 366 A.2d 65 (1976) (citations omitted). Thus, the question is best framed, "Would the jury receive appreciable help from a psychiatrist on the subject of the voluntariness of a defendant's statement to the police?" In answering this question it is important to remember that coercion need not be physical in nature. Rather, many coercive techniques are psychological in nature, wearing down the defendant's ability to exercise free will.

> Since *Chambers v. Florida,* 309 U.S. 227 [60 S.Ct. 472, 84 L.Ed. 716], this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition. A number of cases have demonstrated, if demonstration were needed, that the efficiency of the rack and thumbscrew can be matched, given the proper subject, by more sophisticated modes of "persuasion."

*Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960) (footnote omitted). *See also, Bryant v. State,* 49 Md.App. 272, 431 A.2d 714 (1981).

In summarizing its voluntariness decisions, the Court noted that the totality of all the circumstances surrounding the confession must be measured in assessing "the *psychological impact on the accused.*" *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (emphasis added). *See also, United States ex rel. Adams v. Bensinger,* 507 F.2d 390 (7th Cir.1974). Thus, it is important to scrutinize not only the external forces, i.e., police conduct, upon the defendant, but it is also necessary to examine closely the internal impact of those forces upon the defendant.

■ In *People v. Parks,* 195 Colo. 344, 579 P.2d 76 (1978), the Colorado Supreme Court addressed the admissibility of

psychiatric testimony regarding the voluntariness of a defendant's statements. In holding that the trial court did not abuse its discretion in admitting such testimony, the Court noted that "expert psychiatric testimony regarding the defendant's mental ability to make free and intelligent decisions at the time of his or her arrest is generally relevant to the issues before the court." *Id.* 579 P.2d at 78 (citations omitted). *See also United States v. Smith,* 638 F.2d 131 (9th Cir.1981); *United States v. Corey,* 625 F.2d 704 (5th Cir. 1980); and *People v. Fordyce,* 200 Colo. 153, 612 P.2d 1131 (1980). In fact, the State in its brief, concedes that such opinion testimony is admissible. We are of the opinion that such psychiatric testimony is relevant.

Having so determined, it is now necessary to decide whether the trial court erred in refusing to allow Dr. Crowley to answer the hypothetical question posed by appellant's counsel.

■ In the instant case, the appellant offered Dr. Crowley's testimony at the suppression hearing as well as at the trial. At the suppression hearing, Dr. Crowley sat in court and listened to all the testimony concerning the circumstances surrounding appellant's statements to the police. Dr. Crowley was then asked for his opinion on the voluntariness of those statements. The State objected to the question, and the trial court sustained the objection. In the words of the prosecuting attorney, "we have testimony here that's in great conflict. Is he [Dr. Crowley] supposed to resolve in his own mind which of that he believes and bases his opinion on that...." Subsequently, defense counsel agreed to state the facts upon which Dr. Crowley was to base his testimony and then to have Dr. Crowley give his opinion. The procedure was correct. An expert witness cannot base his opinion on testimony that he has heard when that testimony contains factual disputes.

Such [hypothetical] questions are usually and properly asked in one of two ways. One is where the evidence is uncontradicted and the witness has heard or read it. In

such a case he is asked to express an opinion predicated upon the assumption that the evidence thus known to him is true. The other way is to state to the witness such facts as are essential to the formation of a fair and intelligent opinion, ask him to assume the truth of the facts so stated, and to express an opinion upon them.

*Gordon v. Opalecky,* 152 Md. 536, 548–549, 137 A. 299 (1927); *see also, Nolan v. Dillon,* 261 Md. 516, 532, 276 A.2d 36 (1971), and cases contained therein; and 2 Wigmore, *Evidence* §§ 681–682 (Chadbourn rev. 1979).

After defense counsel recited to Dr. Crowley which facts he was to rely upon in reaching his opinion, the trial court permitted Dr. Crowley to testify. Appellant contends that having allowed Dr. Crowley to testify at the suppression hearing, the trial court was required to allow him to testify at trial, by virtue of the following language in *Day v. State,* 196 Md. 384, 399, 76 A.2d 729 (1950):

The practice in this State, approved in many cases, is that the court first hears evidence without the jury to determine whether a confession is voluntary and should be admitted. If it decides to admit it, *the same evidence is then given to the jury,* as it has the final determination, irrespective of the court's preliminary decision, whether or not the confession is voluntary, and whether it should be believed. In so doing, *the jury is entitled to have before it all of the evidence which affects the voluntary character of the document, and which the court passed upon in admitting it.* (Emphasis added.)

We point out, however, that the emphasized language quoted above was dicta and concerned a practice adopted in this state long before *Jackson v. Denno, supra,* announced that due process required a two-stage procedure for passing on voluntariness of confessions. Furthermore, it obviously cannot be taken literally. Clearly inadmissible evidence should certainly not be given to the jury even if a judge had received it at a suppression hearing; clearly admissible evidence should be given to the jury whether or not it had earlier been received at a suppression hearing. The Court of

Appeals in *Day* was describing a procedure, not creating a new rule of evidence.

We shall, therefore, consider the court's ruling on the hypothetical question without regard to the fact that a different judge than the one who presided at the trial had permitted Dr. Crowley to voice his opinion at the suppression hearing.

■ It is well settled that the admissibility of a hypothetical question lies largely in the discretion of the trial court. *O'Doherty v. Catonsville P. & H. Co.,* 269 Md. 371, 376, 306 A.2d 248 (1973); *Nolan v. Dillon, supra.*

■ The State argued that the hypothetical question posed at the trial was faulty in its form. At trial, the State contended that the question did not include all of the facts surrounding the statements. Although the State has not pursued this argument on appeal, we feel compelled to address it in order to reiterate the law on this subject. "A hypothetical question need contain only a fair summary of the material facts in evidence essential to the formulation of a rational opinion concerning the matter to which it relates." *Yellow Cab Company v. Bisasky,* 11 Md.App. 491, 502, 275 A.2d 193 (1971) (citations omitted); *see also, Williams v. Dawidowicz,* 209 Md. 77, 86, 120 A.2d 399 (1956). If a hypothetical question contains a fair summary of the evidence upon which the expert may base his opinion but the opposing party wishes additional facts to be considered by the expert, the question is not objectionable. The opposing party may cross-examine the expert to inquire what effect the additional facts would have on his opinion. *Williams v. State,* 64 Md. 384, 392–393, 1 A. 887 (1885). Here, the question contained sufficient facts in order for Dr. Crowley to form an opinion. In fact, when defense counsel asked the prosecuting attorney at a bench conference to name the missing essential facts, the prosecuting attorney was either unable or unwilling to do so.

■ One of the principal reasons given by the court in sustaining the State's objection to the hypothetical question

was that Dr. Crowley was being asked to render an opinion on the ultimate issue before the jury—voluntariness of the accused's inculpatory statement—without ever having examined the accused. While it is true that a medical expert may give an opinion without ever having seen the patient, *Marshall v. Sellers,* 188 Md. 508, 517, 53 A.2d 5 (1947), such factor going to the weight and credibility of the opinion rather than its admissibility, *People v. Parks, supra,* 579 P.2d at 78–79, it may certainly be considered by the court in exercising discretion regarding a specific hypothetical question on a particular issue.

██ Bearing in mind that Finke himself had never asserted that his statement was involuntary, it was clear that the hypothetical question propounded to Dr. Crowley was designed to elicit an opinion not related specifically to the effect of all the assumed facts on Finke himself. In effect, Dr. Crowley was being asked to render a general opinion that, assuming certain facts were true, a statement made by some hypothetical person—not Finke but *a* man of Finke's age, experience and general background—was not voluntary. The trial judge concluded that, under those circumstances, the jury would not receive appreciable help on the particular issue from an answer to the hypothetical question propounded to Dr. Crowley. We cannot say that such conclusion amounted to an abuse of discretion.

## VII. EVIDENCE OF APPELLANT'S PRIOR CRIMINAL ACTIVITY

At trial, Detective March testified that he had previously interviewed Finke at the Anne Arundel County Police Department in December 1975. He testified that Finke had been arrested, that he had been advised of his rights under *Miranda* [*v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)], that he waived those rights and eventually confessed to the crime under investigation. Detective March also testified that Finke had undergone a polygraph examination in April 1973 at the police department. The

trial court instructed the jury that neither Finke's prior arrest nor his earlier taking of a polygraph were evidence as to guilt or innocence. Rather, the trial court made clear that these matters were relevant only as to Finke's state of mind at the time of his interrogation. Nonetheless, Finke argues that admission of these matters was unduly prejudicial to him and, thus, reversible error.

■ This court has previously listed various factors "which should not be overlooked" when evaluating the voluntariness of a confession. *Leuschner v. State, supra.* Included in this list is the defendant's "record as to former crimes...." *Id.* 45 Md.App. at 351, 413 A.2d 227. The court relied upon three Supreme Court decisions, *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); *Stein v. New York,* 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); and *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957), in making its observation. Examining a defendant's prior record is consistent with the necessity to examine the "totality of the circumstances" when determining if a confession has been voluntarily given. "The limits in any case depend upon a weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will and mind might be utterly ineffective against an experienced criminal." *Stein, supra,* 346 U.S. at 185, 73 S.Ct. at 1093. In ruling that the challenged confessions were made voluntarily, the *Stein* Court found it significant that the defendants "were not inexperienced in the ways of crime or its detection, nor were they dumb as to their rights." *Id.* at 185–86, 73 S.Ct. at 1093. Thus, the trial court did not err in admitting evidence of Finke's prior arrest and his prior taking of a polygraph examination. *Johnson v. State, supra.*

■ Appellant's reliance upon *Ross v. State,* 276 Md. 664, 350 A.2d 680 (1976), is misplaced. In *Ross,* the Court of Appeals held that evidence of crimes other than the one being tried must not be used to prove the criminal agency of the defendant. "[T]he state may not present evidence of

other criminal acts of the accused unless the evidence is 'substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character.' " *Id.* at 669, 350 A.2d 680 (citation omitted). Here, Finke's prior arrest was not admitted to prove that Finke committed the murder of Mrs. Shilling. It was admitted only to bear on the voluntariness of his statements to the police, and it was relevant to that issue.

## VIII. CHANGE OF VENUE

■ Before trial, appellant filed a Suggestion for Removal, contending that pretrial publicity, consisting of newspaper reports of his arrest, indictment, initial trial and particularly the finding of guilt, sentencing, and appeal, was so pervasive and prejudicial that he could not receive a fair retrial in Anne Arundel County.

At the hearing on the motion, appellant placed into evidence a file containing newspaper articles from the *Baltimore Sun,* the Annapolis *Evening Capital,* and the *Maryland Gazette.* A number of articles in the summer of 1979 reported the arrest of appellant and the police employment of a Delaware psychic to assist in the investigation. Twelve articles—two from the *Sun,* two from the *Gazette,* and eight from the *Capital*—reported appellant's conviction or post-conviction matters which indicated that a jury had found appellant guilty of first degree murder. A headline for the lead story on page one of the December 8, 1979, issue of the *Capital* read: "Finke guilty of killing aunt." And the page one lead story of the January 19, 1980, *Gazette* was headlined: "Finke gets life in Shilling case." The court also heard the testimony of Joseph E. Finke, appellant's father, who described the deep and extensive roots of his family and the victim's in Anne Arundel County. At a fund-raising event for appellant's defense and elsewhere, hundreds of people had told him they followed the case. At the end of the hearing the court noted the prejudicial nature of the

newspaper articles but reserved ruling until after jury *voir dire.*

The panel of prospective jurors consisted of 75 individuals. When asked whether any of them had heard or discussed anything about this case, 34 responded in the affirmative. Of those 34, 11 were struck for cause; the others having indicated that they could render a fair verdict notwithstanding what they may have heard or read about the case. Five more potential jurors were struck for cause on other grounds, leaving 59 potential jurors, 23 of whom acknowledged having heard or read something about the case. Since he was entitled to 20 peremptory strikes and the State to 10, with 12 jurors eventually to be chosen, appellant asserts that in the strategic exercise of his peremptory challenges, *see Spencer v. State,* 20 Md.App. 201, 208, 314 A.2d 727 (1974), he unavoidably and prejudicially was constrained to take into account those jurors who had heard about the case. He could not be expected to disregard the jurors' representations that they could deliver an impartial verdict despite what they had heard or read.

The State acknowledges the accuracy of the figures cited by appellant but asserts that of the 11 prospective jurors who were struck for cause after acknowledging that they had heard or read about or discussed the case, 8 were stricken because they were friends or acquaintances of the victim or appellant or had formed opinions based on what they heard in the neighborhood rather than what they had read in newspapers.

The transcript of the *voir dire* examination of the 34 prospective jurors who acknowledged that they had heard, read or talked about the case confirms the State's asseveration. Despite all the publicity mentioned by appellant in his motion and the newspaper articles he submitted in support of that motion, which covered the crime, the investigation, the arrest and indictment of appellant, the trial and conviction, and the reversal on appeal, out of 34 panel members who recalled reading or hearing about the case, only 2

remembered any details at all. Of those two, one recalled that the papers said Finke was guilty and another recalled a reference to a psychic who divined that someone related to the deceased was responsible for her death. A third panel member did not remember any details of what he had read but felt he could not be impartial.

Both appellant and the State rely upon *Simms v. State,* 49 Md.App. 515, 433 A.2d 1199 (1981). Appellant quotes from Simms:

> "It is not all publicity that causes prejudice to a defendant, but only that publicity that operates to deprive defendant of a fair trial. Such publicity is the type that proclaims the defendant's guilt in advance of trial and prejudices the minds of the public against the defendant to such an extent that most people are unable to weigh the evidence objectively."

*Id.* at 521, 433 A.2d 1199, quoting *United States v. Mandel,* 415 F.Supp. 1033, 1073 (D.Md.1976).

The State, in turn, quotes the following language from *Simms:*

> A party moving for a change of venue carries a heavy burden of satisfying the court that there is so great a prejudice against him that he cannot obtain a fair and impartial trial. Generally, in order to meet this burden, the defendant must show in non-capital cases "(1) that the newspaper article [or pretrial publicity] is prejudicial, (2) that a juror has read the prejudicial newspaper article [or otherwise been exposed to the prejudicial publicity], and (3) that the juror's decision at the trial was influenced by that newspaper article [or pretrial publicity]." . . .

> *Voir dire* examination is usually a sufficient mechanism to insure that a defendant obtains a fair and impartial trial despite the pretrial publicity. . . . This may be satisfied if each venireman empaneled indicates that he has not formed an opinion of defendant's guilt or innocence as a result of the pretrial publicity or that the pretrial publicity would not "in any way derogate from his ability

to give the defendant a fair and impartial trial," as was done in the instant case.

*Id.* 49 Md.App. at 518–519, 433 A.2d 1199 (citations omitted).

We agree that the publicity was pervasive and prejudicial in nature. But its impact on the public, as demonstrated by the *voir dire* examination of the panel, was negligible. We find no abuse of discretion in the court's refusal to remove the case.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.